Catherine S. LESLIE

v.

The PHILADELPHIA 1976 BICENTEN-
NIAL CORPORATION et al.

Civ. A. No. 70-3503.

United States District Court,
E. D. Pennsylvania.

Sept. 10, 1971.

**84**

Harry Lore, Philadelphia, Pa., for plaintiff.

Henry T. Reath, Robert Pratter, Duane, Morris & Heckscher, Philadelphia, Pa., for defendants.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

On December 12, 1969, plaintiff, Catherine Leslie ("Leslie"), was hired by defendant The Philadelphia 1976 Bicentennial Corporation ("Bicentennial Corp.") as its Coordinator of Community Development.[1] Leslie's complaint alleges that it was agreed that her employment was to be through the year 1976, during which it is contemplated that an international exposition celebrating the 200th anniversary of the founding of our nation will take place in Philadelphia, under the aegis of Bicentennial Corp. On October 20, 1970, Leslie was discharged from her employment by Bicentennial Corp., setting the stage for this action.

Leslie's complaint alleges that she was discharged because of her exercise of First Amendment rights of speech and association. Leslie charges that Bicentennial Corp. had manifested a disregard of, and an antipathy towards, the black community of the City of Philadelphia, of which she is a member and that when she spoke out in an effort to alter Bicentennial Corp.'s "collision course" with the black community, her employment was terminated without notice or hearing. Jurisdiction is invoked under the Civil Rights Act, 42 U.S.C. §§ 1981, 1983, 1985, 1985(3) and 28 U.S.C. § 1343, to redress the deprivation under color of state law of rights, privileges and immunities secured by the Constitution. Leslie also claims: (1) that the *manner* of her discharge violated her Fourteenth Amendment rights; and (2) that during the course of her employment with Bicentennial Corp., she was discriminated against because of her sex, by being compensated at a rate less than that paid to male employees doing comparable work, so as to give rise to a claim under Title VII of the 1964 Civil Rights Act, § 706(f), 42 U.S.C. 2000e–5(f).

Bicentennial Corp. is a non-profit Pennsylvania corporation. Named as defendants in addition to Bicentennial Corp. are Henderson Supplee, Jr. ("Supplee"), its Chairman of the Board and Robert McLean, 3d ("McLean"), its Vice President of Administration, the latter being the individual who discharged Leslie.[2]

---

1. Leslie was hired at a salary of $13,000.00 per year.

2. Supplee and McLean have since resigned their positions with Bicentennial Corp.

Bicentennial Corp. has filed a motion to dismiss as to Supplee and McLean on the ground that the complaint fails to state a claim for relief against them individually. In its motion, Bicentennial Corp. also asserts that the Court lacks jurisdiction over the equal opportunity claim because Leslie has failed to exhaust her administrative remedies with respect thereto. In addition to its motion, Bicentennial Corp. has filed an answer in which it denies Leslie's allegations that she was discharged because of her exercise of First Amendment rights. In its answer, Bicentennial Corp. has averred: (1) that it was indeed responsive to the attitudes of the black community; (2) that it encouraged Leslie to express her views to the corporation, and cooperated with her in her work; (3) that Leslie chose to make public statements and to take public actions without notice to the corporation or its administrative staff, which undermined its cooperation with the black community; (4) that Leslie was then informed that a replacement was being sought for her, but that her services were still desired in a different capacity; (5) that ultimately a replacement for her was found; (6) that Leslie then held a press conference charging the Bicentennial Corp. administration with being racially biased; and (7) that following the press conference Leslie was discharged "in the best interests of herself and the corporation".

In addition to the foregoing, Bicentennial Corp.'s answer raises the contention that the Court's jurisdiction is not properly invoked because the corporation's action in discharging Leslie is not state action within the meaning of the Fourteenth Amendment and the Civil Rights Act. Leslie concedes that if state action is not present, federal jurisdiction fails. The parties and the Court agreed that this aspect of the case was severable, and accordingly a trial was held on this issue alone, consisting principally of documentary exhibits. We have received briefs and heard oral argument, and, in this Opinion, proceed to determine the state action question. We will also dispose of Bicentennial Corp.'s motion to dismiss the action against Supplee and McLean and its motion to dismiss the equal opportunity count.

II. *Is Bicentennial Corp.'s Action State Action Within The Meaning Of The Civil Rights Act?*

The year 1976 will mark the two hundredth anniversary of American independence, and Americans will celebrate the event.[3] The Declaration of Independence was signed in Philadelphia, and for over a decade, civic minded Philadelphians and government officials have been planning for an international exposition to be held in their city as the focal point of the national bicentennial celebration. Bicentennial Corp. has been the vehicle for these efforts.[4]

3. The American Revolution Bicentennial Commission was formally established July 4, 1966 through the enactment of public law 89–491. The Commission was charged with preparing and coordinating an overall national program for the observance and commemoration of the bicentennial of the American Revolution.

4. The Philadelphia 1976 Bicentennial Corporation, organized on March 22, 1967, was the product of years of effort dating back to the late 1950's. What culminated with plans for a bicentennial celebration in Philadelphia began with the planning groups initiated by the junior chamber of commerce at the request of former mayor Richardson Dilworth. In 1964, the City Planning Commission, at the request of Mayor James H. J. Tate, developed the first bicentennial plan. A committee of two hundred was appointed by the mayor, which set about to further plans for the bicentennial. This work was continued by the formal corporation organized in 1967. Since that time, Bicentennial Corp. has had a rather checkered career. In its efforts to forge a community effort, it has been a center of controversy. There have been ebbs and peaks in its development as it has reacted to the various moods of the community. The original Philadelphia 1976 Bicentennial Corporation, the one sued, has gone out of existence. On January 14, 1971, a new corporation was organized named the

At this juncture, we turn to a consideration of Bicentennial Corp.'s history and structure, and its funding and assets. In the course of our Discussion, we will touch upon Bicentennial Corp.'s manner of operation.

A. *Corporate History and Structure*

Bicentennial Corp.'s formal origin was in Resolution No. 282 of the Philadelphia City Council, adopted February 9, 1967. The ordinance requested the City Solicitor:

"to take all steps necessary for the creation of a non-profit corporation, the function of which will be to coordinate and carry out all activities for the furtherance of the objectives of the City of Philadelphia and various other business, civic and historical groups or organizations in securing official designation of the City of Philadelphia as the focal point of the national celebration in 1976 of the two hundredth anniversary of the signing of the American Declaration of Independence."

The resolution designated as the incorporators a cross-section of private citizens and public officials, including the Mayor and City Solicitor of the City of Philadelphia, and the President of Philadelphia City Council. When the corporation was formed, its place of business was listed as Room 1660 Municipal Services Building, the office of the Philadelphia City Representative and Director of Commerce.

On March 22, 1967, articles of incorporation prepared by the City Solicitor were filed in the Court of Common Pleas of Philadelphia (March Term, 1967, No. 252). Article III of the articles of incorporation set forth the purposes for which the corporation is formed. These purposes include:

"A. To plan, organize, construct, hold and operate in the City of Philadelphia and adjacent and nearby counties in the Commonwealth of Pennsylvania, and in the States of New Jersey and Delaware, appropriate celebrations, events and exhibitions and the buildings and areas to contain them for the observation of and in commemoration of the bicentennial of the birth of American freedom and of American independence, the Bicentennial of the American Revolution and the Bicentennial of the signing of the Declaration of Independence in Philadelphia in 1976. Said celebrations and events and exhibitions shall be for the exclusively educational purposes of informing and enlightening the peoples of the world as to the importance of individual liberty in the affairs of

American Bicentennial Corporation, with which the former Philadelphia 1976 Bicentennial Corporation merged. See *infra.* The surviving American Bicentennial Corporation, however, took the name Philadelphia 1976 Bicentennial Corporation. A major task of Bicentennial Corp. was to obtain the approval of Philadelphia as the principal bicentennial site from the American Revolution Bicentennial Commission, since other cities were in competition. On June 30, 1970. *Philadelphia was recommended* by the Commission for an international exposition, and on September 11, 1970, President Nixon endorsed this recommendation and directed the State Department to arrange with the International Bureau of Expositions in Paris for reservation of the year 1976 for Philadelphia. The task which constitutes the *sine qua non* of a bicentennial celebration and exposition—site selection—is, however, yet to be finalized.

The planners have considered numerous locations, and, because of their inability to find a suitable one, have, from time to time, considered abandoning the idea of an international exposition as part of the celebration plans. After long deliberations the 30th Street site was rejected as impractical, and the Byberry site was abandoned because of community opposition. The most recent proposed site is a Penn's Landing-Petty's Island-Camden combination. Whether this site will finally prevail we cannot be certain, although Bicentennial Corp. has endorsed it and in recent days the site has received governmental support. No one can be sure at this time whether there will be a bicentennial celebration in Philadelphia, or whether the present corporation will successfully organize it. Suffice it to say that, at the present time, Bicentennial Corp. is viable.

men, the values of products of a free society, representative government, the concept of equal justice under law, the rights of all men to have equal opportunity and to be treated equally regardless of race, creed, color or previous condition of servitude and the other hallowed concepts of which the United States of America was founded and which were expressed in the Declaration of Independence, the United States Constitution and the amendments thereto, and in other documents, and which have been upheld by men of all political parties and of all faiths, creeds, and colors since the signing in Philadelphia on July 4, 1776, of the Declaration of Independence and in addition shall stress the interdependence of all nations in the modern world;

\* \* \* \* \* \*

D. *To act as the agency and corporate instrumentality of Federal, State and local governments for any or all of the above purposes*;

\* \* \* \* \* \*

M. *During the existence of the corporation, it shall be the corporate instrumentality of the City of Philadelphia for the purposes set forth in this charter* which as aforesaid shall have the full beneficial interest in said corporation. The corporation may represent the City of Philadelphia before Government Boards and Commissions, the Bureau of International Expositions and other agencies to obtain support for and in the furtherance of its purposes." [5] (emphasis added).

The Board of Directors included the Mayor of the City of Philadelphia, the Managing Director of the City of Philadelphia, President of the City Council of the City of Philadelphia, and the Lieu-

tenant Governor of the Commonwealth of Pennsylvania. Among the ex officio members of the Board of Directors were the Mayors of the Cities of Wilmington, Trenton and Camden, and various other public officials of the City of Philadelphia and the Commonwealth of Pennsylvania.

For various reasons which are not clear on the record, a new Pennsylvania non-profit corporation called the American Bicentennial Corporation was organized on January 14, 1971, which effectuated a plan of merger with Bicentennial Corp. The joint plan of merger was adopted at a special meeting of the members of Bicentennial Corp. on January 15, 1971. The joint plan of merger was adopted by all the members of the American Bicentennial Corporation on January 15, 1971 and February 24, 1971. The American Bicentennial Corporation, as the surviving entity, assumed the original name of Bicentennial Corp.— "The Philadelphia 1976 Bicentennial Corporation". That its purposes for existence were the same as the original corporation is not in dispute. Moreover, the Articles of Incorporation, Article III, set forth in pertinent part:

"The purposes for which the corporation is being formed are as follows:

D 1. Cooperate with Federal, State and local governments and their agencies and representatives in every way possible in the planning, programming and carrying out of these purposes;

2. Act as the agency and corporate instrumentality of the City of Philadelphia, as well as Federal, State and other local governments for any or all of the above purposes, including, without limitation thereof, representation of such governmental entities before

5. The state, too, was active in planning for the bicentennial celebration. On July 12, 1968, the General Assembly created the Bicentennial Commission of Pennsylvania Act to plan and develop Pennsylvania's participation in the commemoration of the American Revolution. 71 Pa.Stat. § 1047.11 et seq. Among the duties of the commission established by the Act were: "to cooperate with

the nonprofit Philadelphia 1976 Bicentennial Corporation which has been organized at the request of the City of Philadelphia to plan that city's observance; to assist the corporation in achieving an international recognition of the Philadelphia Bicentennial celebration as a key, primary attraction of the national celebration." § 1047.14(3).

the Bureau of International Expositions and other agencies or commissions. * * * ”

This language duplicates the language of the earlier Articles.

The joint plan of merger adopted by both of the corporations provided that certain public officials had the right to appoint a certain number of members to the board of directors. The Governor of Pennsylvania was empowered to appoint two persons, while the Governors of New Jersey and Delaware each could appoint one person. Likewise, the Mayor of Philadelphia was empowered to appoint three persons, and the Mayor of Camden one person, and the President of the City Council of Philadelphia one person, from among the members of the City Council of Philadelphia. The Board of Directors, with members from the public and the private sector, was responsible for the ongoing operations of the corporation.

The parties concede that the merger does not change the operative facts in the case, and that all liabilities of the original corporation were assumed by the new one. The merger having had no significant effect on this case, we shall continue to refer to the merged defendant as "Bicentennial Corp.".

## B. Funding and Assets

One of the purposes of the Bicentennial Corp. is stated to be "to receive, expend and account for funds supplied by federal, state or local governments", or by others. As originally conceived, Bicentennial Corp. was to be a vast joint enterprise involving the public and private sectors. While the Court takes judicial notice of the fact that considerable energies of the private sector have been expended in the Bicentennial Corp.'s cause, the funding to date has been principally a governmental affair.

The statement of income and accumulated income for the fiscal year ending June 30, 1970 indicates that contributions from the public sector amounted to $265,000 (from the City of Philadelphia, the Commonwealth of Pennsylvania, and the State of New Jersey), compared to contributions from the business community of $104,000. The same statement reveals that the corporation received additional income in the form of contracts for planning and various studies from the City and Commonwealth in excess of $495,000. Other similar statements buttress this evidence and reveal the magnitude of the contributions from the public sector.

In the absence of an approved plan, one can only speculate as to what the bicentennial celebration will cost. However, because the corporation has no revenues other than contributions for its income, any plan will call for a continuing financial input from the public sector. This, in turn, will require budget outlays from government sources through 1976. The capital program of the Philadelphia City Planning Commission for the years 1971 through 1976 sets forth a yearly schedule of appropriations ranging from $500,000 for 1971 up to $1,500,000 in 1975 from the City of Philadelphia as part of its contribution to the international exposition. The recommendations of the Planning Commission call for outlays of over $7,000,000 through 1976. In addition, it is contemplated that a large part of the contribution from the City and the Commonwealth will be in land. One plan called for a contribution of 1,000 acres of land valued at $30,000,000.[6] Contributions from the federal government are to include appropriations and a loan guarantee program administered through the Department of Commerce. The fact is that it is impossible for any celebration, whether it includes an international exposition or not, to take place without such large infusion of public funds.

Finally, it is important to note that under Article X of the Bicentennial Corp. charter, the interest of the public in the

6. This referred to the proposed Byberry site, now abandoned, but it is expected that land will still be a major contribution from the public sector.

success or failure of the venture, represented by the City of Philadelphia, is recognized by the provision that:

"Upon dissolution of the corporation, any assets remaining after payment, or adequate provision made for payment of all obligations has been made, shall be transferred to the City of Philadelphia, which shall have the full beneficial interest in the corporation."

### C. *Discussion*

Having reviewed the structural and functional history of Bicentennial Corp., we turn to the determination of whether its alleged acts fall within the ambit of the Fourteenth Amendment and the Civil Rights Act of 1964. In cases arising under the Civil Rights Act, the determination of whether acts are "under color of any statute, ordinance, regulation, custom, or usage, of any State" has been treated the same as the "state action" requirement of the Fourteenth Amendment. *See, e. g.*, United States v. Price, 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966). The facts bearing on the state action determination are essentially undisputed; the parties disagree, however, as to their legal effect.

The position of Bicentennial Corp. is twofold. *First*, it asserts that, notwithstanding the public nature of its end product and some of the language in the Articles of Incorporation, Bicentennial Corp. is essentially a private non-profit corporation, managed by its officers and directors pursuant to its charter and by-laws, in the same manner as any other non-profit corporation. It adverts to the fact, of which the Court takes judicial notice, that there are many non-profit corporations which are totally pro bono in concept and operation, which nonetheless retain their private character. *Secondly*, while conceding that the facts of the case may involve it in state action, and therefore subject it to the dictates of the Fourteenth Amendment and the Civil Rights Act of 1964 for *some purposes* (*e. g.*, its conduct of the fairgrounds), Bicentennial Corp. contends that with respect to its internal opera-

tions, including matters of personnel, it acts in the same manner as any other private non-profit corporation, i. e., beyond the reach of the Fourteenth Amendment and the Civil Rights Act.

In support of its position, Bicentennial Corp. points to factors such as: (1) its employment of private counsel; (2) its entering into contracts with the City and State for certain purposes; (3) the non-liability of the City for its undertakings; (4) the corporation's lack of power to tax; (5) the out-numbering of public Board members (20) by private Board members (68); (6) the total pre-emption of executive positions by private Board members; and (7) the governing of the affairs of the corporation by the charter and by-laws in contrast to any form of governmental control.

As authority for its contention that the act complained of here (i. e., the discharge of Leslie) is severable from other corporate acts that might involve state action, and that the Court must look for state involvement in the very discriminatory act which plaintiff is attacking, Bicentennial Corp. cites Grossner v. Trustees of Columbia University, 287 F. Supp. 535 (S.D.N.Y.1968).

*Grossner* was a civil rights case arising out of the riots and "sit-ins" at Columbia University during 1968. The action was instituted by a group of Columbia University students and members of the University community seeking a preliminary injunction restraining disciplinary proceedings against them following their arrests and suspensions. The complaint alleged that the students and others who sought peacefully to change University policies occupied several of the University's buildings, were forcefully removed by the police, who arrested more than 700 people, and that the University then sought to discipline those arrested. Plaintiffs alleged that these threatened proceedings were undertaken in bad faith with the purpose of punishing them for exercising their First Amendment rights. Despite the fact that Columbia is not a state university in the traditional sense, federal

jurisdiction was claimed: (1) because the state supplied a large percentage of the University's income; (2) because of the University's conduct of a substantial amount of research for public bodies, financed by public funds; and (3) and on the theory that the University is, in the essential nature of its functioning, sufficiently public as to make it subject to the state action limitation.

Judge Frankel rejected plaintiffs' contentions on the existence of federal jurisdiction. Concerning the expenditure of public funds, he wrote:

"A more fundamental point against plaintiff is that receipt of money from the State is not, without a good deal more, enough to make the recipient an agency or instrumentality of the Government. Otherwise, all kinds of contractors and enterprises, increasingly dependent upon government business for much larger proportions of income than those here in question, would find themselves charged with 'state action' in the performance of all kinds of functions we still consider and treat as essentially 'private' for all presently relevant purposes." *Id.* at 547, 548.

The *Grossner* court also inquired as to the extent to which the State and the "formally 'private' agency" remained truly independent, but could not find any substantial or relevant degree of interconnection between the State and University, especially in the disciplinary proceedings. Finding that the State had not "insinuated itself into a position of interdependence" with the University in the challenged activity (see Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), *infra*), the court held that the University's acts did not partake of state action and were not reviewable under the Civil Rights Act of 1964.[7]

■ We agree with Judge Frankel that receipt of money from the state is not, "without a good deal more", enough to make the recipient an agency or instrumentality of the government. However, as the facts appear here, we find that "good deal more" which makes Bicentennial Corp., in fact, an agency of the state. Before exegesis of that finding must come an examination of Burton v. Wilmington Parking Authority, *supra*, which is the landmark case establishing guidelines for determining when state involvement in private conduct gives rise to a claim of state action.

In *Burton*, the Supreme Court held that the action of the management of a coffee shop, located within an off-street public parking facility leased from a public authority, in refusing to serve a negro, was state action within the meaning of the Fourteenth Amendment. In so doing, it overruled the Delaware Supreme Court, which had held that the coffee shop had acted in a purely private capacity. The following facts were the basis for the Court's conclusion: the land and buildings were publicly owned and were dedicated to public uses; the costs of acquisition, construction and maintenance were defrayed entirely by donations by the city, loans and revenue bonds; the Authority was responsible

7. The Second Circuit again considered the question of possible state insinuation into the area of discipline in a private college in Coleman v. Wagner College, 429 F. 2d 1120 (1970), where students expelled following an occupation of the Dean's office sought reinstatement pending disciplinary hearings and to restrain the college from any racially discriminatory expulsions. The court reversed and remanded the case back to the district court for a hearing to determine whether the enactment of New York State Education Law, McKinney's Consol.Laws, c. 16, § 6450, requiring every college in the State of New York to file with the regents and the Commissioner of Education "rules and regulations for the maintenance of public order on college campuses" represented a "meaningful state intrusion into the disciplinary policies of private colleges and universities". Thus it is possible that this legislative action on disciplinary procedures may have changed the state action picture in New York. In contrast, see Blackburn v. Fisk University, 443 F.2d 121 (6th Cir. 1971).

for upkeep and maintenance of the building and these costs were paid out of public funds; there was an incidental variety of mutual benefits conferred by having a parking facility available for restaurant guests and vice-versa; because of the relationship with the parking facility, the restaurant would benefit from tax exemption for any improvements it might make, since the fee was held by a tax-exempt government agency; the restaurant was operated as an integral part of a public building devoted to a public parking service, and, the Authority could have, in its lease, "affirmatively required" the coffee shop to discharge the responsibilities under the Fourteenth Amendment.

The *Burton* Court did not find any particular fact as controlling, and noted that, taken separately, they had no constitutional consequences. Pointing out that there are no "readily applicable formulae", thus making it necessary to "sift facts" and "weigh circumstances", it concluded that these facts, when grouped together, reached that level of significance which rendered the restaurant's discrimination subject to the Fourteenth Amendment. Mr. Justice Clark uttered the Court's synthesis:

> "By its inaction, the Authority, and through it the State, has not only made itself a party to the refusal of service, but has elected to place its power, property and prestige behind the admitted discrimination. *The State has so far insinuated itself into a position of interdependence with Eagle that it must be recognized as a joint participant in the challenged activity*, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment."

*Id.* at 725, 81 S.Ct. at 862 (emphasis supplied).

There are, of course a myriad of factual situations in which the private-state relationships are arrayed in various permutations and combinations. A number have been litigated as to their state action consequences and the *Burton* principle variously applied.[8] The case we find most apposite is McQueen v. Druker, 438 F.2d 781 (1st Cir. 1971). In that case, tenants threatened with eviction from a housing project brought an action for damages and for injunctive and declaratory relief against the landlord. The land on which the housing was constructed was purchased from the city redevelopment authority, which had condemned it in connection with its urban renewal program. To insure proper use of the land, a land disposition agreement required the landlord to adhere to many standards governing the physical plant, limitations on rental agreements as to amount, duration and increases, admission policies, management and transfer of title. The landlord claimed that his intention not to renew the tenant's lease was a private act and cited to the *Grossner* decision as authority. The court, however, after reviewing the relationship between the landlord and the redevelopment authority concluded that the state supervision of the operations went beyond merely placing state "power, property and prestige" behind the discriminatory action of a private restaurateur-lessee in a public building, as was the case in *Burton*. The court stated:

> "Here the landlords are, in return for an assured consideration, and subject to specific and continuing oversight, helping the state realize its specific priority objective of providing for ur-

8. *See, e. g.*, Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966) (removal of city as trustee of park established by will but for whites only without any change in longstanding practice of municipal maintenance involved state in unconstitutional segregation); Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967) (article of California Constitution prohibiting state from denying right of any person to decline to sell, lease or rent his real property to whomever he chooses struck down because it involved state in private racial discriminations); and *cf.* Lewis, Burton v. Wilmington Parking Authority—A Case Without Precedent, 61 Colum.L.Rev. 1458 (1961).

ban renewal displacees and its more general goal of providing good quality housing at rents which can be afforded by those of low and moderate income. *The stronger posture of government supervision present in this case is not unrelated to the fact that the government has chosen to attract the participation of private persons in carrying out a specific governmental purpose." Id.,* 438 F.2d at 784 (emphasis supplied).

The court held that the activities of the private landlord took on the color of state law and made applicable the due process clause of the Fourteenth Amendment.

In an interesting and perceptive footnote, Judge Coffin, speaking for the *Mc-Queen* court, described the somewhat tenuous nature of deciding what private acts are so meshed with state involvement as to come within the ambit of the Fourteenth Amendment. Speaking of the rather vaporous standards courts in this area are forced to deal with, Judge Coffin asserted that:

> "We concede that little guidance in making a principled decision is found in such serpentine words as 'insinuated', 'involved', 'entwined', or 'intertwining'. Commentators have varied in approving or disapproving this lack of precision, but all have recognized it." *Id.* at 783 (citations omitted).

Although we cannot help but observe that the challenge Judge Coffin describes is encountered on a regular basis by those engaged in the judicial process, we agree with the tenor of his remarks. However, in this case, we find no difficulty in deciding whether the government has "insinuated" or "entwined" itself in Bicentennial Corp.'s activities.

Recapitulating the undisputed facts recited above, Article III D of the Articles of Incorporation of the Bicentennial Corp. provides that it is *"To act as the agency and corporate instrumentality* of Federal, State and local govern-ments for any or all of the above purposes"; Article III E authorizes the corporation "To receive, expend and account for funds supplied by Federal, State or local governments"; Article III M provides that the corporation during its existence *"shall be the corporate instrumentality of the City of Philadelphia * * * which shall have the full bene-ficial interest in said corporation"* and "may represent the City of Philadelphia before Government Boards and Commissions"; and Article III L provides that after the replacement by the corporation of its obligations, "all of the assets then owned by it shall be granted and conveyed to the City * * * and shall thereafter be the property of the City * * *."[9] (emphasis supplied).

Bicentennial Corp. was formed by the Philadelphia City Solicitor pursuant to an ordinance of City Council which even named the incorporators. The Articles and By-Laws require significant public representation on the Board. From the very beginning, it was contemplated that the public funds would be the principal vehicle for carrying the enterprise forward, and the history of the corporation has borne out that public funds have provided, and will continue to provide, the lion's share. One significant element of the governmental contribution is expected to be land. And, although the location of the bicentennial site is by no means certain, it is anticipated that publicly owned land, either presently owned or acquired commercially by eminent domain will provide the bicentennial site. Another significant element of the public contribution not previously mentioned is provision of the transportation and other services and facilities necessary to support an exposition of the magnitude that has been contemplated. When one considers the enormity of that responsibility, the amount of necessary governmental input and concomitant governmental "say" in Bicentennial Corp.'s decision-making process becomes at once apparent.

---

9. Though numbered differently, the Articles and By-Laws of the successor corporation contain the same provisions.

What becomes, upon reflection, equally apparent is that the language we have cited from the Articles and By-Laws is no accident or error of draftsmanship. To the contrary, the language used is entirely appropriate. No bicentennial celebration could conceivably operate as a purely private venture. Pervasive governmental participation is just as much a *sine qua non* as the harnessing of the valuable energies of the private sector.

We find not only that the State (in this case acting principally through its political subdivision, the City of Philadelphia) has "so far insinuated itself into a position of interdependence with Bicentennial Corp. that it must be recognized as a joint participant in the challenged activity" (Burton v. Wilmington Parking Authority, *supra*), but also that Bicentennial Corp. is, as plaintiff characterizes it, the "surrogate of the State" with respect to the plans for 1976. In this respect, we find the facts here far stronger than those in McQueen v. Druker, *supra*, where the court nonetheless found that the government supervision involved was related to the fact that the government had chosen to attract the participation of private persons in carrying out a specific governmental objective. Nor can there be any question that the case at bar is far different from Grossner v. Trustees of Columbia University, *supra*, where the allegation of state insinuation was based principally upon funding.

In holding that Bicentennial Corp. is the surrogate or corporate instrumentality of the State for purposes of planning a bicentennial celebration, and that whatever it does partakes of state action, including matters involving personnel, the *Grossner* inquiry (i. e., into the very discriminatory act which is challenged becomes unnecessary.

Our holding does not dispose of the case. Having said that the Fourteenth Amendment and the Civil Rights Act apply, we express no view here as to the merits, or, put differently, as to *how* the Fourteenth Amendment and the Civil Rights Act apply. Whether Bicentennial Corp. had a right to discharge Leslie, or whether it accorded her due process in doing so, will be determined at a trial on the merits, to be held on a date which we shall fix presently after consultation with counsel.

### III. *Does The Complaint State A Cause Of Action Against Supplee And McLean?*

As we have seen, Leslie has stated her claim against Supplee and McLean in addition to Bicentennial Corp. In order to do so successfully, it is necessary that she allege that Supplee and McLean acted in individual capacities, as opposed to corporate capacities, with respect to her. The only pertinent allegations, however, are that Supplee and McLean, respectively Chairman of the Board and Vice-President of Administration of Bicentennial Corp., "disagreed with and were intolerant of the opinions and criticisms of plaintiff and did not concede her right to free expression and association, and because they sought to intimidate, not only plaintiff, but all black citizens of the City of Philadelphia" and that as punishment for her exercise of her constitutionally protected rights, she was discharged from her position without the benefit of due process.

These allegations as to the individual defendants are not sufficient to state a claim for relief. Our overall reading of the complaint is that the references to Supplee and McLean are to their corporate, not personal, actions. The complaint fails to allege that the individual defendants assumed any personal obligations concerning Leslie's employment with the corporation. Supplee and McLean, of course, cannot be held personally liable for the debts, liabilities or obligations of the corporation. 15 Pa.Stat. § 7509. Moreover, it is fundamental that a corporate officer cannot be held liable on a contract between the corporation and a third-party unless the corporate officer assumes a personal obligation in the contract itself. Accordingly, defendants' motion to dismiss the complaint as to the individual defendants shall be granted.

## IV. The Equal Employment Opportunity Count

■ . Count II of Leslie's complaint asserts a cause of action under Title VII of the Civil Rights Act of 1964, *supra*, for discrimination on account of her sex during the course of her employment with Bicentennial Corp.[11] Factually, Leslie alleges that she was compensated at a rate less than that paid to male employees doing the same or comparable work. Bicentennial Corp. has moved to dismiss this count, asserting that the Court lacks jurisdiction since Leslie failed to exhaust her administrative remedies as required by § 2000e–5(a), (f).

The Civil Rights Act provides an administrative grievance procedure which must be pursued before an employee can seek relief for alleged unlawful employment practice in the district court. Part of that procedure requires an employee to file a complaint with the Equal Employment Opportunity Commission within a specified period of time after the alleged unlawful practice occurred. Leslie's counsel notified the Equal Employment Opportunity Commission, Washington, D. C., of her grievance, but did not file a complaint. That fact, however, is peripheral to our resolution of this aspect of the matter. The real problem here is that it is questionable as to whether Title VII applies to Bicentennial

Corp. Under the Act, "employee" is defined as "a person engaged in an industry affecting commerce who has twenty-five or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year * * *." Leslie has not made sufficient factual allegations for us to determine whether or not Bicentennial Corp. is an employer within the meaning of the Act. Accordingly, we will grant the motion to dismiss the equal employment opportunity count of the complaint with leave to Leslie to amend that count within twenty days.[12]

In connection with an amendment to her complaint, Leslie will want to consider that the 1964 Act exempts from its coverage "a State or political subdivision thereof".[13] We have already found Bicentennial Corp. to be a corporate instrumentality of the State. While that is not the same as saying that it is a political subdivision, we will defer ruling on the question of whether Bicentennial Corp. is within or without the political subdivision exclusion, for an amendment will have to be filed anyway if Leslie wishes to preserve the count, and the parties will doubtless wish to brief the point, not having already done so. If a motion to dismiss is directed to the amended complaint, we can then consider any and all grounds on which Leslie contends she is entitled to relief for lack of equal pay.

---

11. 42 U.S.C. § 2000e–2(a) provides, in part:

"It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin * * *."

12. Part of Bicentennial Corp.'s motion was an alternative prayer to dismiss the equal employment opportunity count of the complaint on the ground that the Act does not apply.

13. 42 U.S.C. § 2000e(b) provides, in part: "(b) The term 'employer' means a person engaged in an industry affecting commerce who has twenty-five or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such person, but *such term does not include (1) the United States, a corporation wholly owned by the Government of the United States, an Indian tribe, or a State or political subdivision thereof* * * *." (emphasis supplied).