**PENTHOUSE INTERNATIONAL LTD., Plaintiff,**

v.

**Andrew C. PUTKA, Director, et al., Defendants.**

Civ. A. No. C77–779.

United States District Court, N. D. Ohio, E. D.

Aug. 23, 1977.

Clarence D. Rogers, Jr., Rogers, Horton & Forbes, Cleveland, Ohio, Niki Z. Schwartz, Gold, ROTATORI, Messerman & Schwartz, Cleveland, Ohio, Roy Grutman, Eaton, Van Winkle, Greenspoon & Grutman, New York City, for Penthouse Intern. Ltd.

Howard H. Fishkin, Asst. Law Director, Cleveland, Ohio, for Andrew C. Putka, Director, Ralph J. Perk, Mayor, and the City of Cleveland.

Morlee A. Rothchild, Michael H. Diamant, Kahn, Kleinman, Yanowitz & Arnson, Cleveland, Ohio, for Aero Cleveland, Inc.

## MEMORANDUM AND ORDER

KRUPANSKY, District Judge.

On July 20, 1977 the Court granted plaintiff's Motion for a Temporary Restraining Order which enjoined the City of Cleveland, its Mayor and officers from invoking paragraph 6.11 of the Concession Agreement between the City of Cleveland and Aero Cleveland, Inc. so as to restrict or limit the sale and distribution of Penthouse magazine at newsstands and concession facilities at the Cleveland Hopkins International Airport. Thereafter, on August 8, 1977, this matter came on for a hearing on plaintiff's Motion for a Preliminary Injunction. In addition to the testimony and evidence and memorandums of law presented at the hearing, the parties filed joint stipulations of fact, the relevant portions of which are set forth below:

1. Plaintiff, Penthouse International, Ltd., is a New York corporation, whose principal offices in the United States are located at 909 Third Avenue, New York, New York, which regularly publishes, among other publications, an internationally circulated magazine called "Penthouse".

2. Defendant, Ralph J. Perk, is the duly elected Mayor of the defendant, City of Cleveland, a municipal corporation in, and

of, the State of Ohio. Defendant, Andrew C. Putka, is the duly appointed (by defendant Perk) Director of the Department of Port Control of the City of Cleveland, having jurisdiction over Cleveland Hopkins Airport, among other facilities.

3. Defendant, Aero Cleveland, Inc., is a corporation which, pursuant to a contract with the City of Cleveland entitled Concession Agreement No. 27571 . . ., operates the newsstand concessions at Cleveland Hopkins Airport.

4. All defendants are citizens of the State of Ohio.

5. On June 3, 1977, defendant Putka, acting upon the instructions of defendant Perk, directed Herbert Gruber, Manager of Hopkins Airport Newsstands for Aero Cleveland, Inc., to remove all magazines and books which contain explicit pictures of nudity or explicit descriptions of sexual activity from its newsstands at Cleveland Hopkins Airport and any other facility controlled by the Department of Port Control. The oral directive of June 3, 1977, was confirmed by letter dated June 8, 1977, from defendant Putka to Manager Gruber . . . .

6. Defendant, Aero Cleveland, Inc., immediately complied with the directive of June 3, 1977, and removed from its newsstands the July issue of Penthouse . . , together with a number of other publications listed in a letter dated June 8, 1977, to defendant Putka from Bruce Taylor, Assistant Director of Law of the City of Cleveland . . . . Penthouse Magazine has not been sold at the Cleveland Hopkins Airport since said time, despite Penthouse's desire to resume sales.

7. Neither prior to, nor following, the removal of "Penthouse" from the newsstands at the Cleveland Hopkins Airport on June 3, 1977, was plaintiff given notice or opportunity to be heard on the constitutionality or legality of said removal.

The testimony and evidence presented at the hearing further disclosed that the City of Cleveland is the owner of the Cleveland Hopkins International Airport; that on April 5, 1976, the City entered into a contract (Concession Agreement No. 27571) with Aero Cleveland, Inc. (Aero), wherein Aero agreed to manage and operate newsstand concessions at the airport "in order to provide reading materials and certain sundry items to air travelers and patrons of the Airport."

The concession agreement permits the City to exercise considerable control over the daily operation and management of Aero's concession facilities. For example, in describing the sales rights and limitations of Aero, paragraph 1.2 of the contract states:

Concessionaire may operate the concession granted and use the concession premises solely for the purpose of selling the following items and for no other purpose whatsoever: (a) Newspapers (Local and out of town); (b) Magazines, periodicals and tobacco products not exceeding Two Dollars ($2.00) in price; (c) Gum, candies, and packaged candies not exceeding One Dollar ($1.00) in price; (d) Novelties, souvenirs, and postal cards not exceeding three dollars ($3.00) in price; (e) Ten cent (10¢) gum and candy mints and fifteen cent (15¢) candy bars, which items must be made available for sale to the public at all times; (f) Paper backed books of all price ranges; (g) Such specified additional items as the Commissioner of Airports may from time to time in writing authorize the Concessionaire to sell, provided, however, it is expressly understood and agreed between the City and Concessionaire that the Commissioner of Airports may at his sole discretion either authorize or disapprove the sale of any specified additional item.

Article two of the contract discusses the location, size, condition and improvement of the leased concession premises. Articles three and four provide the term of the concession rights, rental payments and termination of the agreement. Rent is established as the greater of 14% of Aero's gross receipts or a certain guaranteed annual sum.

Article 5 provides that Aero shall maintain business records and accounts which shall be made available to the City for

inspection or audit upon reasonable notice. In Article 6, Aero agreed to "appoint a highly qualified local business manager," to provide trained personnel who "shall wear name tags and shall be neatly dressed and/or appropriately uniformed, if required by the Commissioner of Airports." Paragraph 6.4 directs Aero to "control the conduct, demeanor and appearance of all its employees, and upon objection by the Commissioner of Airports concerning any such conduct, demeanor or appearance, Concessionaire shall remedy the cause for objection."

Several of the remaining paragraphs of Article 6 further demonstrate the pervasive municipal influence over the Aero concessions operation:

6.5 Initially, Concessionaire shall be open for business between the hours of 6 a.m. to 12 midnight daily. The Commissioner of Airports may require such extensions of business hours up to and including a twenty-four hour operation, as he deems necessary from time to time to properly serve patrons of the Airport. Reductions in authorized business hours may be made only upon the prior written approval of the Commissioner of Airports.

6.6 Prior to commencing operations hereunder, Concessionaire shall prepare and submit to the Commissioner of Airports for approval, a proposed price list for the various items of merchandise Concessionaire is authorized to sell from the premises. Prices for such items of merchandise to be sold shall be comparable to prices for such items in other similar airport newsstand facilities. Once approved, such prices shall not be changed without the prior written approval of the Commissioner of Airports.

\*　　\*　　\*　　\*　　\*　　\*

6.8 Concessionaire shall not install any fixtures to the premises nor alter or modify said premises in any manner without the prior written approval of the Commissioner of Airports.

\*　　\*　　\*　　\*　　\*　　\*

6.10 Concessionaire shall not erect, maintain or display any placards, signs or any form of advertising on its equipment, areas or elsewhere at the Airport without the prior written consent of the Commissioner of Airports. Any placard, sign or other form of advertising erected, maintained or displayed without such consent may be removed by City at Concessionaire's expense.

6.11 Upon notice from the Commissioner of Airports, Concessionaire shall cease selling from the premises any item of merchandise which said Commissioner determines to be inappropriate for sale at the Airport newsstands.

Indeed, it was the exercise of municipal authority pursuant to paragraph 6.11 that gave rise to this action.

As the parties have agreed by stipulation, Penthouse magazine, along with several other magazines and paperbacked books, was removed from the Airport newsstands, as directed by Mayor Ralph J. Perk, and Andrew C. Putka, Director of Port Control, in accordance with the authority vested in the municipal government by paragraph 6.11 of the concession agreement. The parties have agreed, indeed the testimony has shown, that prior to the removal of the allegedly obscene publications, there was no independent judicial determination that any of those publications were in fact obscene. Upon these facts, plaintiff asserts that the foregoing acts constitute an unreasonable and unconstitutional prior restraint, abridging plaintiff's exercise of its freedom of speech and of the press, as guaranteed by the First and Fourteenth Amendments to the Constitution of the United States. The jurisdiction of the Court is properly invoked pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983, and 28 U.S.C. §§ 1331 and 1343. Plaintiff also asserts a violation of the Sherman Antitrust Act, 15 U.S.C. § 1. The Complaint requests declaratory judgment and injunctive relief, together with punitive damages and attorneys fees.

Initially, the Court is constrained to observe that the purported obscenity of Penthouse magazine is not here in issue. Rath-

er, that issue may be properly placed before the appropriate state tribunal. The sole issue before this Court is the charge of prior restraint, and the asserted infringement of First Amendment rights resulting from the Mayor's directive which ignored the procedural safeguards of due process. *See Southeastern Promotions Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975).

■ In affirmative defense, defendants question plaintiff's standing to initiate this action. Defendants assert that the determination to remove certain allegedly obscene publications from the Airport newsstands is contractual in nature, arising from Concession Agreement No. 27571, between the City of Cleveland and Aero Cleveland, Inc., to which Penthouse International, Ltd., the publisher of Penthouse magazine, one of the publications removed from the Airport newsstands, is not a party; that as a result, plaintiff has no standing to assert constitutional infringement arising from actions taken under the contract. The Court does not agree.

Although the ban was not initiated directly against plaintiff, it has, nonetheless, experienced some palpable injury as a result of the removal of its magazine from the Airport newsstands. As reflected by the pronouncements of the Supreme Court in *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 64, n. 6, 83 S.Ct. 631, 636, 9 L.Ed.2d 584 (1963):

Appellants' standing has not been, nor could it be, successfully questioned. The appellants have in fact suffered a palpable injury as a result of the acts alleged to violate federal law, and at the same time their injury has been a legal injury. See *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 151–152, 71 S.Ct. 624, 637–638, 95 L.Ed. 817 (concurring opinion). . . . Furthermore, appellants are not in the position of mere proxies arguing another's constitutional rights. The constitutional guarantee of freedom of the press embraces the circulation of books as well as their publication. *Lovell v. City of Griffin,* 303 U.S.

444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949, and the direct and obviously intended result of the Commission's activities was to curtail the circulation in Rhode Island of books published by appellants. Finally, pragmatic considerations argue strongly for the standing of publishers in cases such as the present one. The distributor who is prevented from selling a few titles is not likely to sustain sufficient economic injury to induce him to seek judicial vindication of his rights. The publisher has the greater economic stake, because suppression of a particular book prevents him from recouping his investment in publishing it. Unless he is permitted to sue, infringements of freedom of the press may too often go unremedied.

*See also HMH Publishing Co., Inc. v. Garrett,* 151 F.Supp. 903 (N.D.Ind.1957); *New American Library of World Literature, Inc. v. Allen,* 114 F.Supp. 823 (N.D.Ohio 1953). Accordingly, the Court concludes that plaintiff Penthouse International, Ltd. is possessed of the requisite *locus standi* to proceed with this action.

■ Initially, the Court observes that defendant City of Cleveland is a municipal corporation and not a "person" within the purview of 42 U.S.C. § 1983. *City of Kenosha v. Bruno,* 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973); *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); *Amen v. City of Dearborn,* 532 F.2d 554 (6th Cir. 1976); *Hanna v. Drobnick,* 514 F.2d 393 (6th Cir. 1975); *Bosely v. City of Euclid,* 496 F.2d 193 (6th Cir. 1974). Although, in accordance with the foregoing case authority, the claim against the City of Cleveland pursuant to 42 U.S.C. § 1983 is subject to dismissal upon proper motion, the Court further recognizes an alternative cause of action approved by the Sixth Circuit Court of Appeals under 28 U.S.C. § 1331. *Amen v. City of Dearborn, supra; Hanna v. Drobnick, supra; Bosely v. City of Euclid, supra.*

Defendants' principal defense against the charged violation of 42 U.S.C. § 1983 is that the removal of Penthouse and other similar magazines was not effected "under color of

law," an essential element of any claim under this Congressional enactment. Challenging plaintiff's contention that the requisite state action was present here, defendants assert that the City, acting in its proprietary capacity and pursuant to contract did not invoke its governmental authority in banning certain publications from the Airport.

It is settled that one may seek redress, pursuant to § 1983, for the deprivation of rights, privileges or immunities secured by the Constitution or laws of the United States only when such deprivation occurs "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory. . . ." It is not necessary to allege that the acts in question were authorized by the state or its political subdivisions, however, "facts must be stated showing that the defendants were clothed with the authority of the state and were purporting to act thereunder." *Sykes v. State of California,* 497 F.2d 197, 200, n. 2 (9th Cir. 1974).

Generally, a private person is not liable under § 1983 unless his wrongful conduct was done "under color of law" or with the authority of the Government. *Guedry v. Ford,* 431 F.2d 660 (5th Cir. 1970); *Wallach v. Cannon,* 357 F.2d 557 (8th Cir. 1966); *Marshall v. Sawyer,* 301 F.2d 639 (9th Cir. 1962). As stated by the Supreme Court of the United States in *Adickes v. S. H. Kress and Company,* 398 U.S. 144, 152, 90 S.Ct. 1598, 1606, 26 L.Ed.2d 142 (1970), therein quoting *United States v. Price,* 383 U.S. 787, 794, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966):

> "Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of the statute. To act 'under color' of the law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents," *United States v. Price,* 383 U.S. 787, 794, 86 S.Ct. 1152, 1157 (1966). (footnote omitted).

See also *Sykes v. State of California, supra.*

Private corporations, proprietary municipal corporations, and employees and agents thereof, may be deemed to act under color of law. *See Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); *Leslie v. Philadelphia 1976 Bicentennial Corporation,* 332 F.Supp. 83 (E.D.Pa.1971). For example, a number of courts have specifically concluded that the requisite state action was present in § 1983 civil rights actions against public housing authorities and private corporations acting in the same capacity, which derive financial assistance or legal authority from state or municipal governments. *Caulder v. Durham Housing Authority,* 433 F.2d 998 (4th Cir. 1970), *cert. denied,* 401 U.S. 1003, 91 S.Ct. 1228, 28 L.Ed.2d 539 (1971); *McClellan v. University Heights, Inc.,* 338 F.Supp. 374 (D.R.I.1972); *McMichael v. Chester Housing Authority,* 325 F.Supp. 147 (E.D.Pa.1971); *McQueen v. Druker,* 317 F.Supp. 1122 (D.Mass.1970), *aff'd,* 438 F.2d 781 (1st Cir. 1971); *Colon v. Tompkins Square Neighbors, Inc.,* 294 F.Supp. 134 (S.D.N.Y.1968); *Smith v. Holiday Inns of America Inc.,* 220 F.Supp. 1 (M.D.Tenn.1963), *aff'd,* 336 F.2d 630 (6th Cir. 1964). Indeed, in *Bernard v. Slechta,* Civil No. C76–762 (N.D.Ohio Nov. 10, 1976), this Court held that proprietary agents of a municipal government, as well as government officers, acted under color of law in threatening to evict tenants living in apartments owned and leased by the City of Euclid.

A municipal corporation and its officers may not shield themselves against claimed civil rights violations by enveloping their conduct with the cloak of proprietary activity, particularly when the government involvement and control is as pervasive as that demonstrated in this action. To hold otherwise would emasculate the entire concept of state action under § 1983. Particularly apropos are the following decisions which support this conclusion: *City of St. Petersburg v. Alsup,* 238 F.2d 830 (5th Cir. 1956), *cert. denied,* 353 U.S. 922, 77 S.Ct. 680, 1 L.Ed.2d 719 (1957) (municipally owned swimming pool); *Anderson v. Moses,*

185 F.Supp. 727 (S.D.N.Y.1960) (restaurant concession in a municipally owned park); *Coke v. City of Atlanta*, 184 F.Supp. 579 (N.D.Ga.1960) (restaurant concession in a municipally owned airport). Upon review of the testimony and evidence presented at the hearing and upon a thorough examination of the foregoing case authority, the Court concludes that the defendants herein acted under color of law, within the purview of 42 U.S.C. § 1983.

▋ Proceeding to a determination of plaintiff's charge of prior restraint, the Court observes, initially, that freedom of speech and freedom from prior restraint are not absolute rights. As stated by the Supreme Court of the United States in *Times Film Corporation v. City of Chicago*, 365 U.S. 43, 47–48, 81 S.Ct. 391, 394, 5 L.Ed.2d 403 (1961):

> It has never been held that liberty of speech is absolute. Nor has it been suggested that all previous restraints on speech are invalid. On the contrary, in *Near v. State of Minnesota ex rel. Olson*, 1931, 283 U.S. 697, 715–716, 51 S.Ct. 625, 631, 75 L.Ed. 1357, Chief Justice Hughes, in discussing the classic legal statements concerning the immunity of the press from censorship, observed that the principle forbidding previous restraint "is stated too broadly, if every such restraint is deemed to be prohibited * * *. [T]he protection even as to previous restraint is not absolutely unlimited. But the limitation has been recognized only in exceptional cases." These included, the Chief Justice found, utterances creating "a hindrance" to the Government's war effort, and "actual obstruction to its recruiting service or the publication of the sailing dates of transports or the number and location of troops." In addition, the Court said that "the primary requirements of decency may be enforced against obscene publications" and the "security of the community life may be protected against incitements to acts of violence and the overthrow by force of orderly government."

*See also Southeastern Promotions, Ltd. v. Conrad, supra; Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963); *Kingsley Books v. Brown*, 354 U.S. 436, 77 S.Ct. 1325, 1 L.Ed.2d 1469 (1957). It is settled law that "obscene material is unprotected by the First Amendment." *Miller v. California*, 413 U.S. 15, 23, 93 S.Ct. 2607, 2614, 37 L.Ed.2d 419 (1973). *See Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973); *Kois v. Wisconsin*, 408 U.S. 229, 92 S.Ct. 2245, 33 L.Ed.2d 312 (1972).

▋ Nonetheless, allegedly obscene publications may not be summarily banned in the absence of the procedural safeguards of due process. *See, e. g., Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). In *Bantam Books, Inc. v. Sullivan* the Rhode Island Commission to Encourage Morality in Youth, a creation of the Rhode Island Legislature, circulated among municipal law enforcement agencies lists of "objectionable" publications, which resulted in the intimidation of magazine and book distributors, under threat of prosecution, and effected a *de facto* ban on the distribution and circulation of allegedly obscene publications. In concluding that the Commission, acting under color of law, imposed an unconstitutional prior restraint on the circulation of certain publications, the Court stated at 372 U.S. 70–71, 83 S.Ct. 639–40:

> What Rhode Island has done, in fact, has been to subject the distribution of publications to a system of prior administrative restraints, since the Commission is not a judicial body and its decisions to list particular publications as objectionable do not follow judicial determinations that such publications may lawfully be banned. Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity. . . . We have tolerated such a system only where it operated under judicial superintendence and assured an almost immediate judicial determination of the validity of the restraint. . . . The system at bar includes no

such saving features. On the contrary, its capacity for suppression of constitutionally protected publications is far in excess of that of the typical licensing scheme held constitutionally invalid by this Court. There is no provision whatever for judicial superintendence before notices issue or even for judicial review of the Commission's determinations of objectionableness. The publisher or distributor is not even entitled to notice and hearing before his publications are listed by the Commission as objectionable. (footnote and citations omitted).

To determine if the actions complained of here constitute an unconstitutional prior restraint, the Court must also consider the very specific guidelines established by the Supreme Court in *Southeastern Promotions, Ltd. v. Conrad, supra.* The facts in that case disclosed a prior restraint on the stage production of the controversial rock musical "Hair" at the Chattanooga Memorial Auditorium, a privately owned theater under long-term lease to the City of Chattanooga, Tennessee. In that case, the directors of the theater, all appointed by the mayor of Chattanooga, banned the presentation of "Hair" for its alleged obscenity, without first viewing the musical or otherwise subjecting the production to judicial scrutiny.

Citing to its prior decision in *Bantam Books, Inc. v. Sullivan, supra,* the Court stated at 420 U.S. at 559, 95 S.Ct. at 1247:

In order to be held lawful, respondents' action, first, must fit within one of the narrowly defined exceptions to the prohibition against prior restraints, and, second, must have been accomplished with procedural safeguards that reduce the danger of suppressing constitutionally protected speech. *Bantam Books, Inc. v. Sullivan,* 372 U.S., at 71, 83 S.Ct., at 639.

The Court went on to describe the procedural safeguards necessary to the constitutionality of any system of prior restraint:

*First,* the burden of instituting judicial proceedings, and of proving that the material is unprotected, must rest on the censor. *Second,* any restraint prior to

judicial review can be imposed only for a specified brief period and only for the purpose of preserving the status quo. *Third,* a prompt final judicial determination must be assured.

*Southeastern Promotions, Inc. v. Conrad, supra* at 560, 95 S.Ct. at 1247.

The facts and circumstances which have evolved in the instant case are not unlike those presented in *HMH Publishing Co. v. Garrett, supra.* Therein a deputy prosecutor for Lake County, Indiana prepared a list of publications which he considered to be in violation of the state's pernicious literature statute. Without actually threatening prosecution, the deputy prosecutor transmitted this list to the attorney representing a local magazine distributor, suggesting that "for the benefit of your client perhaps you might forward to him this list." Immediately upon receipt of the letter, the distributor ceased distribution of Playboy magazine.

■ The district court determined that the conduct of the deputy prosecutor constituted an unconstitutional prior restraint, stating at 151 F.Supp. at 905:

In the instant case the plaintiff's right to have its magazine circulated and sold has been denied. It has not been afforded a fair hearing before an impartial tribunal in a determination that its magazine comes within the ban of the pernicious literature statute. Rather, the determination took the form of a prejudgment by the prosecutor without the plaintiff being given an opportunity to demonstrate, if it could, that its magazine does not come within the proscription of the statute. What statutory standards or evidentiary proof the prosecutor used in making his decision are unknown. His decision resulted in a fiat which was contrary to the plaintiff's right to the safeguards of the Due Process Clause of the Fourteenth Amendment.

In the case presently before this Court, the mayor's war on pornography suffers the same deficiency of procedural due process.

■ Because Penthouse and other magazines were banned from Cleveland Hop-

kins International Airport as allegedly obscene publications, the actions taken by the Mayor and the Director of Port Control of the City of Cleveland fell within the narrowly defined exceptions to the prohibition against prior restraints, satisfying the first condition announced in *Southeastern Promotions, Inc. v. Conrad* and *Bantam Books, Inc. v. Sullivan.* However, the Mayor's directive to remove such publications from the Airport newsstands evidenced none of the three required elements of procedural safeguards, established by the Supreme Court in *Southeastern Promotions, Inc. v. Conrad,* under the second condition authorizing prior restraint. The Court therefore determines that the Mayor's prohibition of the sale of "all magazines and books which contain explicit pictures of nudity or explicit descriptions of sexual activity" was an unconstitutional prior restraint on plaintiff's First Amendment rights. As previously stated by the Court, however, this determination does not reflect upon the issue of obscenity; and the Court does not here determine if Penthouse magazine is or is not obscene. That issue is not before the Court. *Southeastern Promotions, Inc. v. Conrad, supra* 420 U.S. at 562, 95 S.Ct. 1239. Accordingly, plaintiff's request for injunctive relief must be granted.

Although the Court has determined that injunctive relief is warranted in this case, that finding does not extend to the mandatory injunctive relief requested in the Complaint. Plaintiff further pursues the directive of this Court "ordering defendants, and each of them to reinstate 'Penthouse' at all newsstands and vending machine locations for sale to the public in such manner as said sales were permitted prior to the action set forth in the complaint." The Court, however, may no more order the sale of Penthouse magazine, than it may direct the City of Cleveland or any of its Airport concessionaires to sell and distribute comic books or any other form of printed publication.

 To order Aero Cleveland, Inc. to sell Penthouse magazine is to order Aero to buy the magazine. This Court will not, indeed this Court cannot, impress its will upon the independent business judgment of a private entrepreneur in the day to day conduct of his business. The Court cannot and will not intrude upon the business operations of Aero Cleveland, Inc. or otherwise interfere with Aero's right to contract with whomever it selects. The coextensive right of the City of Cleveland to freely enter into any contractual relationship and upon any terms the parties may select, consistent with basic constitutional and contractual precepts of law, (particularly the due process limitation on state action), is similarly recognized by the Court. Nonetheless, where the constitutional rights of free speech and free press weigh in the balance, the scales must necessarily tip in favor of these fundamental freedoms.

In granting an injunction upon the prior restraint of plaintiff's First Amendment rights, the Court extends to both plaintiff and Aero Cleveland, Inc. every constitutional safeguard necessary to ensure against retaliatory termination of Aero's lease and concession agreement or other manifestations of bias or prejudice on the part of the City in transacting business with Aero. Included among these safeguards is the right, enjoyed equally by Penthouse and Aero Cleveland, Inc., to seek imposition of contempt sanctions for violations of this Court's injunction. These assurances are acknowledged as necessary to permit Aero to operate freely and independently of unconstitutional demands placed upon it under the veil of contract provisions, and to permit Aero to make an independent determination regarding the merchandise and publications it elects to offer to the public.

Finally, the Court has reviewed the allegations of the Complaint raised pursuant to section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and determines that they fail to establish the jurisdiction of this Court over the Second Claim of the Complaint. Section 1 of Title 15, United States Code, declares illegal "every contract, combination in the form of trust or otherwise, or conspiracy, *in restraint of trade or commerce among the several States, or with foreign nations*" (emphasis added). In order for the interstate commerce allegations of the

Complaint to be jurisdictionally sound, "they must allege either 1) activities that are in the flow of interstate commerce, or 2) activities which though occurring purely on a local level substantially affect interstate commerce." *Doctors, Inc. v. Blue Cross of Greater Philadelphia*, 490 F.2d 48, 50 (3d Cir. 1973); *Sun Valley Disposal Co. v. Silver State Disposal Co.*, 420 F.2d 341 (9th Cir. 1969); *Evans v. S. S. Kresge Company*, 394 F.Supp. 817 (W.D.Pa.1975), *aff'd*, 544 F.2d 1184 (10th Cir. 1976), *petition for cert. denied*, —— U.S. ——, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977) (No. 76–1033); *United States v. Richter Concrete Corporation*, 328 F.Supp. 1061 (S.D.Ohio 1971).

The concept of free enterprise, however, spurred by the broad scope of interstate commerce, appeals for some limit to the intrusiveness of Sherman Antitrust Act regulation.

Since every enterprise, however localized, inevitably has some effect, however remote, on the flow of commerce among the states, some "localness," "remoteness," or "de minimis" factor must intervene or federal regulation is boundless. *Rasmussen v. American Dairy Association*, 472 F.2d 517, 526 (9th Cir.), *cert. denied*, 412 U.S. 950, 93 S.Ct. 3014, 37 L.Ed.2d 1003 (1973). In essence, the test is whether the facts and circumstances of the particular situation at bar determine that the relationship to interstate commerce is too tenuous, in a practical sense, to warrant federal control. *Id.* at 524. Thus, "restraints which only affect interstate commerce in some insignificant degree or attenuated sense are not within the federal commerce power." *Evans v. S. S. Kresge Company, supra* at 828. Alternately stated, the test of jurisdiction "is not that the acts complained of affect a business engaged in interstate commerce, but that the conduct complained of affects the interstate commerce of such business." *Page v. Work*, 290 F.2d 323, 330 (9th Cir.), *cert. denied*, 368 U.S. 875, 82 S.Ct. 121, 7 L.Ed.2d 76 (1961). *See Lieberthal v. North Country Lanes, Inc.*, 332 F.2d 269 (2d Cir. 1964).

Defendant Aero Cleveland, Inc. is, without question, engaged solely in the local sale of sundry food products, reading material and novelty items. Its business is limited to the concession stands at the Airport. That it may employ some items of equipment or purchase for sale some consumer products which may have moved at one time or another in interstate commerce, does not extend its business operations beyond the local level or significantly affect interstate commerce. *Sun Valley Disposal Co. v. Silver State Disposal Co., supra; Lieberthal v. North Country Lanes, Inc., supra; Page v. Work, supra; Evans v. S. S. Kresge Company, supra.* In consequence, the removal of certain products from Aero's shelves has a decidedly local affect upon commerce, which is not within the purview of the Sherman Antitrust Act, 15 U.S.C. § 1. Since the Court lacks jurisdiction over the subject matter of plaintiff's antitrust claims, the Second Claim of the Complaint must be dismissed, pursuant to Rule 12(h)(3), Fed.R.Civ.P.

The Court, having thoroughly reviewed the testimony and evidence presented at the hearing on plaintiff's Motion for Preliminary Injunction and having carefully examined all of the pleadings filed herein, determines that no unresolved issues remain for consideration. (Defendant City of Cleveland asserts a desire to cross-examine Irwin E. Billman, Executive Vice President of Penthouse International, Ltd. whose affidavit was filed in support of plaintiff's Motion for Temporary Restraining Order. However, Billman's affidavit, comprised primarily of self-serving laudation of Penthouse magazine, provided little, if any, support to the Court's decision to grant a preliminary injunction, the necessary supportive facts being presented by witnesses at the hearing, particularly defendant's chief witness, Andrew C. Putka, Director of Port Control. Furthermore, counsel for the City has pressed the City's request to cross-examine Billman on matters which, as this Court has consistently held, are not here in issue, namely, the alleged obscenity of Penthouse magazine).

Accordingly, there being nothing further before this Court, the preliminary injunction granted herein is made permanent and

IT IS HEREBY ORDERED that defendants, and each of them, their officers, agents, representatives, members, attorneys and all other persons to whom notice or knowledge of this Order shall come and all persons acting or purporting to act in aid of or in conjunction or concert with defendants are hereby permanently restrained and enjoined from invoking or enforcing or attempting to invoke or enforce paragraph 6.11 of the Concession Agreement No. 27571, in the absence of required procedural safeguards of due process as set forth in this Order and the cases cited herein, so as to restrict or limit the sale and distribution of Penthouse magazine, or any other allegedly obscene magazine, at any of the concession facilities operated or managed by Aero Cleveland, Inc. at the Cleveland Hopkins International Airport; and said individuals are furthermore permanently restrained and enjoined from intimidating, threatening, coercing or attempting to intimidate, threaten or coerce Aero Cleveland, Inc., or any other tenant or concessionaire, their officers, agents, representatives, and attorneys so as to prevent or attempt to prevent them from selling or distributing Penthouse magazine, or any other magazine at any of the concession facilities operated at the Cleveland Hopkins International Airport, or any other municipally owned building or facility, in the absence of required procedural safeguards of due process as set forth in this Order and the cases cited herein.

IT IS FURTHER ORDERED that the Second Claim of the Complaint, raised pursuant to 15 U.S.C. § 1, is hereby dismissed, pursuant to Rule 12(h)(3), Fed.R.Civ.P., for lack of subject matter jurisdiction.

IT IS SO ORDERED.