**Bruce JONES, Plaintiff,**

v.

**Rev. Richard A. BATTLES et al., Members of the Board of Education for the Town of Hartford, Defendants.**

**Civ. A. No. 13856.**

United States District Court,
D. Connecticut.

July 29, 1970.

Bruce Mayor, Hartford, Conn., for plaintiff.

Armand A. Korzenik, Asst. Corp. Counsel, Hartford, Conn., for defendants.

## RULING ON PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF

CLARIE, District Judge.

The plaintiff has commenced this civil action pursuant to the provisions of the Civil Rights Act, 42 U.S.C. § 1983; jurisdiction is established under 28 U.S.C. § 1343(3). The petitioner is seeking both a preliminary and a permanent injunction to restrain the Hartford Board of Education from refusing to renew his one-year contract as a non-tenured probationary teacher. He claims that the Board's action in not renewing his employment contract was unwarranted and designed to retaliate for certain public utterances by him at an open public hearing (Tr. 64) before the School Board. On that occasion, he identified the Director of Secondary Education in the Hartford School System by name, labelled him as a liar, and questioned not only his honesty and competency but also challenged the integrity of the entire administrative staff of the Board of Education. He now comes into Court and claims that his language and criticism is protected under the first, fifth, and fourteenth amendments to the Federal Constitution. He asks that the Court declare § 3 of the Hartford Teachers' Tenure Law invalid and unenforceable for vagueness, claiming that it denies him due process of law under the Constitution of the United States. The

Court finds that the plaintiff's representations are without legal merit and accordingly dismisses the action.

The plaintiff was originally hired as a teacher in the Hartford School System, subject to a teaching assignment by the Board of Education, to render professional services during the budgetary fiscal period, September 1, 1969 through March 31, 1970.[1] The employment contract contained an automatic renewal each year during the teacher's first three years of employment, unless he received written notice that the contract would not be renewed for the ensuing year. It reserved the right to the Board to terminate the contract at any time for cause and it entitled the teacher to the right of having a hearing, provided a written request was filed within ten days from the date of receiving the Board's notice of its intention to terminate. The contract expressly stated that it was subject to the state statutes as well as the rules and regulations of the Hartford Board of Education.

On January 22, 1970, the School Board held an open hearing at Weaver High School to discuss school problems without being limited to any special subject agenda. The plaintiff attended this meeting, together with 50 to 75 other members of the public. Weaver High School is composed of predominantly black students and it had been experiencing serious racial problems. Illustrative of the existing emotional climate was the incident of several hundred pupils leaving the school auditorium inclined toward violence to a teacher, followed by a walk-out of a large part of the faculty and the temporary cancellation of classes. (Tr. 16–17).

At the opening of this meeting,[2] the Board Chairman read a guideline statement advising those who might wish to speak, that it was the policy of the Board that there should be no mention of personalities in the remarks which would be made. (Tr. 46). Within the local color of these background circumstances, several of the speakers who addressed the Board discussed the need for more black teachers and better qualified ones. (Tr. 43). The Superintendent of Schools explained the hiring and placement policies of the system, with special emphasis on the efforts then being made to obtain black teachers at Weaver and more well-prepared urban teachers. It was at that point in the meeting that the plaintiff felt constrained to reply to the Superintendent's remarks.

The plaintiff addressed the School Board and related in considerable detail his alleged experiences commencing with his original hiring and teaching assignment. A tape[3] of his remarks discloses that he had been contemplating speaking to the Board on this subject for some time; (Tr. 128) however, he did state that his presence at this particular meeting was one of happenstance. (Tr. 116). He related his initial contacts with members of the administrative staff and how he had expressed a desire to teach at Weaver High School. He claimed that he signed his contract believing that he would be teaching either at Weaver or at Hartford Public High. Subsequently, two assistants to the Superintendent, a Mr. Shea and a Mr. Galiano, told him he had been assigned to teach mathematics and science at the Mark Twain Junior High School, (Tr. 131) but upon being reminded that the plaintiff's preparation was in history, Mr. Galiano officially assigned him to teach social studies in the 8th grade at the New Park Avenue School. (Tr. 129). It was his belief that the school department had mistaken him for another teaching applicant of the same name and that circumstance contributed to the confusion. (Tr. 131).

It appears that the plaintiff was not content with his teaching assignment from the start. (Tr. 132). He dis-

1. Defendant's Exhibit "B".

2. Defendant's Exhibit "A".

3. Said tape was played in Court and appears in the Transcript at pages 128–137.

cussed this on several occasions with Messrs. Shea and Galiano, who were assistants to Dr. Barry, the Director of Secondary Education, (Tr. 70) and also with the latter personally. He stated that Dr. Barry promised him the history position held by a Mary Heslin, at Weaver, provided it became vacant by reason of her election to the City Council. When the vacancy did occur, Dr. Barry advised him that the position would be open to competition. (Tr. 133). Nevertheless, the plaintiff went ahead with the interview meetings he had already arranged with Mr. Dougherty, the principal at Weaver, and with Mary MacDonnell, the Chairman of its History Department. He stated that at this meeting the latter had told him she held a particular bias against the graduate program for urban teaching at Wesleyan University, where plaintiff had taken his graduate courses. He stated that Miss MacDonnell had only had one such full-time Wesleyan M.A.T. program graduate teacher in her department. He further represented to the Board that the person who was finally selected to fill the vacancy he was seeking did not have teacher certification qualifications equal to those which he possessed. (Tr. 135).

The plaintiff then proceeded to state that he did not trust the school authorities with the same trust that he placed in other people. (Tr. 135). Referring to Dr. Barry by name, he said,

"I questioned his ability, obviously, questioned his honesty without a doubt. I wonder if what he did to me is a pattern. I wonder in other words,—to speak with candor that I was speaking to him on September 8th, but with which he wasn't speaking to me—I wonder if Doctor Barry is simply a liar or if Doctor Barry is simply a bad liar?

"The distinction I am making is, are other teachers or other prospective teachers, treated like I was, only the lies are handled better, or, Doctor Barry is he a sore thumb?" (Tr. 136).

On January 25, 1970, a school board member who was present at the open meeting wrote to the chairman (Tr. 22) and requested an immediate investigation of the matter referred to in the plaintiff's statements. She also sought a review of all school policies and procedures relating to the hiring and placement of teachers in the system.[4] A special meeting was called on February 4, 1970,[5] at which the Board had before it a letter addressed to the Superintendent[6] from Dr. Barry complaining about the plaintiff's remarks at the January 22, 1970 meeting. He inquired, "whether or not this procedure of public abuse of your staff will be accepted without challenge * * * if this procedure is not clarified, I feel that the confidence and effectiveness of your administrative staff will be seriously impaired."

At the special board meeting, the Superintendent was instructed to investigate the matter. On February 21, 1970, the Superintendent reported back to the Board that his investigation revealed no evidence to substantiate any of the charges made by the plaintiff. He reviewed the steps taken by him in his attempt to find the truth, together with the correspondence and the conference he had had with the plaintiff.[7]

The conclusions reached by the Superintendent disclosed that there was no tangible evidence to support the plaintiff's claim that his acceptance of employment in the Hartford system was preconditioned upon his being placed in a senior high school teaching position; or that Dr. Barry ever actually promised him Mrs. Heslin's position under the conditions claimed. An outright commitment to a permanent appointment would have been in violation of the Board's agreement with the Teachers' Federation, for their contract required posting permanent vacancies for compet-

4. Plaintiff's Exhibit 1.

5. Plaintiff's Exhibit 2-A.

6. Plaintiff's Exhibit 2-B.

7. Plaintiff's Exhibit 3-B.

itive bids. Policy also required that no vacancy be filled at any high school in the system without first getting the recommendation of that school's principal. At the time the alleged promise was made, the plaintiff had met neither the Weaver High School principal nor Miss MacDonnell, the History department chairman. The Superintendent described the plaintiff's public characterization of Dr. Barry as a liar to be completely without foundation in fact and that the plaintiff had done irreparable harm not only to Dr. Barry but also to Mr. Shea and Mr. Galiano. He then requested that the plaintiff write a letter of public apology.[8]

The plaintiff replied in writing on February 17, 1970,[9] and expressed a willingness to apologize for a misstatement he had made relating to Miss MacDonnell, but declined to apologize for any statement he had made at the meeting concerning Dr. Barry, Mr. Shea, or Mr. Galiano. He accused the Superintendent of Schools of conducting a biased investigation and again alluded to the dishonesty of Dr. Barry. A copy of this letter was sent to all the members of the School Board and to the other supervisory administrative staff members. Upon receipt of this response, the Board, at a special meeting held on February 21, 1970, reviewed the entire matter; six (6) voted not to renew the plaintiff's contract; two (2) voted in his favor and one (1) abstained, taking the position that the matter was not properly a board issue but one which should be handled administratively. (Tr. 38).

As a common practice the Superintendent did not usually refer to the Board matters pertaining to the nonrenewal of contracts for probationary teachers. (Tr. 76). He did so, however, in this instance because he wanted the assurance of Board support before he acted. (Tr. 78).

On February 24, 1970, the Superintendent responded in writing to the plaintiff that the latter's explanation was unacceptable and he advised him that under the terms of the Hartford Teachers' Tenure Law, his contract would not be renewed for the ensuing school year beginning in September 1970. His letter stated:

"Your dismissal from employment with us is on the grounds of misconduct while an employee. To state, as you did, that Dr. Barry and others are liars (without one shred of evidence to support your statements) has led me to the conclusion that your improper conduct and libelous statements make your continued employment with us as a teacher untenable.

"Effective as of the close of school in June, 1970, your employment as a teacher in the Hartford School System is terminated." (Plaintiff's Exhibit 3–D).

Following the receipt of this letter from the Superintendent, the plaintiff invoked the administrative grievance procedures under the Collective Bargaining Agreement. (Tr. 104–5); the validity of these procedures is not in issue. After a full *de novo* hearing,[10] (Tr. 141) at which the petitioner was represented by counsel and had the opportunity to present evidence,[11] the grievance panel affirmed the Board's original decision not to renew.[12] (Tr. 123). While the controversy was pending, prior to the commencement of this action, the plaintiff discussed the content matter of his original statement at teachers' meetings in the school system and statements have appeared in the press, wherein he reiterated his criticism of Dr. Barry and the administrative staff personnel.

The present legal action was then commenced claiming that the defendants had denied employment to the plaintiff because of his having exercised his con-

8. *Supra,* note 7.

9. Plaintiff's Exhibit 3–C.

10. Defendant's Exhibit "D".

11. Defendant's Exhibit "E".

12. Defendant's Exhibit "F".

stitutional right to freedom of speech; and further, that the Special Act,[13] which authorizes the Board to refuse the renewal of a contract for reasons of misconduct is void for vagueness.

## DISCUSSION OF THE LAW

■ The defendants are being sued in their individual capacities as members of the Hartford Board of Education. In performing their official function as members of that board, they are acting as agents of the state under color of state law. Herzig v. Board of Education, 152 Conn. 144, 150, 204 A.2d 827 (1964); Fowler v. Enfield, 138 Conn. 521 (1952); Norwalk Teachers' Ass'n v. Board of Education, 138 Conn. 269, 83 A.2d 482 (1951). The Board's action in not renewing the plaintiff's contract constituted "state action" and the grounds allege a claimed deprivation of rights under the constitution within the meaning of 42 U.S.C. § 1983. Jurisdiction is present pursuant to 28 U.S.C. § 1343(3) and (4).

The plaintiff's status as a teacher is subject to the provisions of a special Act amending the Hartford City Charter and known as the Hartford Teachers' Tenure Act.[14] The relevant parts thereof provide:

> "Those teachers appointed after this Act becomes effective shall be appointed on probation annually for three years, provided their services are satisfactory, or they may be dismissed at any time at the discretion of the board of education. If appointed at the expiration of this probationary period, they shall receive permanent appointments." (Special Laws 1945, Act. No. 277, § 2).

The aforesaid Special Act is analogous to § 10–151 of the Connecticut General Statutes which classifies the rights of tenured teachers compared with those of non-tenured teachers having only a probationary status. The Connecticut State Superior Court has defined this distinction as follows:

> "It is clear that the legislature did not intend to clothe a teacher who has not attained tenure, and the security secured thereby, with the same protections bestowed upon teachers who have proved their worth during their probationary period and have attained tenure. It is equally clear that the legislature did intend to grant nontenure teachers a measure of protection against arbitrary or capricious action by boards of education in respect to the renewal of teaching contracts, without impairing the right of boards of education to make honest and reasonable judgments in respect to the professional competence of probationary teachers. Boards of education once possessed an absolute discretion in regard to the renewal of contracts of nontenure, probationary teachers. The statutory requirements of a statement of reasons for nonrenewal and a hearing make it necessary and essential, in order to fulfil the intent and purpose of the statute, that a board of education must exercise a sound and reasonable discretion in making decisions to renew or not to renew the contracts of nontenure, probationary teachers. This does not mean that a board of education has any burden to establish or prove any statutory reasons for its decision not to renew, or any obligation to withhold or defer such a decision until a hearing is held. Under the statute, it is clear that a board of education has a right to decide not to renew such a contract without a hearing. However, if a board does decide not to renew, it must notify the teacher concerned in writing before March 1 of the school year in which the contract is not to be renewed for the following year, and upon receipt of such notice the teacher may require a statement of the reason or reasons for not renewing his contract." Devlin v. Bennett, 26 Conn.Sup. 102,

---

13. Revised Charter of the City of Hartford, § 7 Appendix.

14. *Supra*, note 13.

109–110, 213 A.2d 725 (1965). Also see, Roth v. Board of Regents, 310 F. Supp. 972 (W.D.Wis.1970).

The question has not been raised by the plaintiff, that he has been denied any procedural or substantive rights afforded him under state law, the Hartford Teachers' Tenure Law, or a non-compliance with the appellate procedures afforded under the Collective Bargaining Agreement. His claim is that the primary reason for the non-renewal of his contract was directly attributable to his public statement concerning certain public school officials in their public capacities. He alleges these criticisms were within the orbit of protected "free speech" as contemplated by the first amendment to the Federal Constitution. The evidence disclosed that the plaintiff's classroom teaching abilities and performance were of adequate standard to have warranted his being recommended for reemployment, had not the present controversy intervened. (Tr. 76).

■ It is now a commonly accepted principle of law, that a public employee has a constitutionally protected right to speak his mind publicly on any matter, although his comments may strongly challenge, or cause severe criticism of, a public official, even though that official may be his nominal superior.

> "(A)bsent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." Pickering v. Board of Education, 391 U.S. 563, 574, 88 S.Ct. 1731, 1738, 20 L. Ed.2d 811 (1968); See also, Keyishian v. Board of Regents, 385 U.S. 589, 87 S. Ct. 675, 17 L.Ed.2d 629 (1967); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952).

■ Thus, if the plaintiff's only alleged misconduct was his making a public statement critical of Dr. Barry, his assistants, other administrative board personnel or the Board itself, even in language likely to be offensive or inimical toward them, this Court would nevertheless protect the plaintiff's right to speak his criticism freely. It is important to the orderly functioning of a democracy to encourage legitimate public comment and criticism of the manner in which public employers conduct public business. This is true despite the fact that other remedial remedies might have been available under the terms of the Collective Bargaining Agreement or that professional ethics might have dictated a more discreet action. In the absence of proof that a teacher knowingly or recklessly engaged in falsehood concerning other school personnel, the School Board, or the school system, relating to official conduct, wide latitude must be allowed to protect and encourage a free and open public discussion and interchange of ideas on matters which belong to the public domain.

This right to fair comment toward the conduct of public officials was pointed up by the United States Supreme Court under analogous circumstances involving an alleged libelous publication in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), wherein the Court said:

> "The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' —that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U. S. at 279–280, 84 S.Ct. at 726. Also see, Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964).

The Court finds, however, that the plaintiff-teacher in this instance transgressed the protected limits of the privilege afforded him under the law. In other words, his statements went beyond legitimate criticism protected by the

first amendment. Contrary to the expressed policy of the Board as expressed at the opening of the meeting not to engage in personalities, the plaintiff's comments were violently abusive and personally defamatory toward his administrative supervisor, the Director of Secondary Education, when he recklessly lashed out at him and said,

> "I wonder if Doctor Barry is simply a liar or if Doctor Barry is simply a bad liar?
>
> "The distinction I am·making is, are other teachers or other prospective teachers, treated like I was, only the lies are handled better, or, Doctor Barry is he a sore thumb?" (Tr. 136).

■ Webster's International Dictionary defines a liar as "one that usually knowingly and habitually utters falsehood; one that lies." To publicly label and indelibly brand a public school administrative officer to his employer, with such personal invective goes beyond the permissive limits of protected free speech and destroys the shield of constitutional protection.

> "(I)t cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Board of Education, *supra*, 391 U.S. at 568, 88 S.Ct. at 1734. Also see, Muller v. Conlisk, 429 F.2d 901 (7 Cir. 1970); Lefcourt v. Legal Aid Society, 312 F.Supp. 1105 (S.D. N.Y.1970); Donovan v. Mobley, 291 F. Supp. 930 (D.C. Cal. 1968).

The plaintiff suggests the Court should conclude that the Superintendent's action in suggesting a written public apology [15] indicates that the latter regarded the incident as one of comparative insignificance. He also represents that if he were returned to his former position, he would be likely to have little contact with the Director of Secondary Education or his assistants or with the administrative staff or teachers at Weaver High School; and that his statements would have little or no effect on the school personnel with whom he would normally be in contact in the course of his daily work as a teacher at the same or other assigned school.

■ The Court finds that plaintiff's abusive language directed toward his nominal superior, was of such a nature as to destroy any likelihood of a future amiable professional relationship between him and the administrative staff. To order that the plaintiff be rehired into this school system under Dr. Barry's general supervision would invite friction and destroy staff morale. Those who would ultimately suffer as a result of such an enforced relationship would be the school children.

More specifically, the plaintiff's return to the Mark Twain School would bring him into direct contact with Mr. Galiano and more remotely with Mr. Shea, both assistants to Dr. Barry. The totality of the surrounding circumstances and the depth of the antagonisms formed firmly confirm the School Board's reasonably founded conclusion that the plaintiff could no longer work effectively and harmoniously within the Hartford school system.

The City of Hartford employs approximately 1800 teachers. (Tr. 75). The issues have been publicized in the press and extensively discussed within the system. The plaintiff's reckless unsupported and subjective accusations plant the seeds of disruptive dissention among the many. The standards of professional conduct expected of a public school teacher must never be lowered to the level of name-calling and abuse under

15. Plaintiff's Exhibits 3–B and 3–C.

the guise of protected free speech. If this was condoned and permitted to occur, it would invite chaos, bitterness and a general loss of morale in all facets of public service.

The Court also finds that § 3 of the Hartford Teachers' Tenure Law, which is also known as Special Law 1945 Act. No. 277, § 3, and incorporated as § 8 of the Appendix to the Hartford City Charter [16] does not deny the plaintiff due process of law on its face or as applied in this instance. The first amendment does not protect the plaintiff's statements in these circumstances and the totality of his overall attitude fully justified the School Board's action in refusing to rehire him as a non-tenured probationary teacher. The action is dismissed. So ordered.

The foregoing opinion shall constitute the findings of fact and conclusions of law required to be filed by the Court pursuant to Rule 52(a), Fed. R. Civ. P.