Catherine S. LESLIE

v.

**PHILADELPHIA 1976 BICENTENNIAL CORPORATION.**

No. 70-3503.

United States District Court, E. D. Pennsylvania.

May 25, 1972.

Harry Lore, Cohen & Lore, Philadelphia, Pa., for plaintiff.

Henry Reath, Duane, Morris & Heckscher, Philadelphia, Pa., for defendant.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

## I. PRELIMINARY STATEMENT

This is a civil rights action. Plaintiff, Catherine S. Leslie ("Leslie"), was formerly the Coordinator of Community Development of the defendant Philadelphia 1976 Bicentennial Corporation ("Bicentennial Corp."). She was discharged from that employment on October 20, 1970, following a series of events which form the basis for the final stage of this lawsuit. In the first stage, following the taking of testimony on the subject, we held that Bicentennial Corp. was the surrogate or corporate instrumentality of the State for purposes of planning a bicentennial celebration, and that whatever it does partakes of state action, including actions involving its personnel. See Leslie v. Philadelphia

1976 Bicentennial Corp., 332 F.Supp. 83 (E.D.Pa.1971). For purposes of this litigation, Leslie is therefore tantamount to a public employee.

Proceeding from the well-settled proposition that the employment of a public employee may not, in general, be terminated for exercise of constitutionally protected rights,[1] Leslie's claim for relief is predicated upon her allegation that her discharge resulted from her exercise of First Amendment rights of speech and association, and more particularly, from criticism by her of the leadership of the Bicentennial Corp. and of its policies which she claimed were racist in character. Leslie seeks declaratory and injunctive relief, as well as damages for lost wages. She claims that her employment was to extend through the winding up of the Bicentennial which she estimated to be around 1978, but possibly as late as 1983.

The Bicentennial Corp. denies Leslie's allegations. *First*, the corporation contends that the true and immanent cause of Leslie's discharge was her lack of competence and capacity to perform her assigned duties. *Second*, conceding that the "last straw" which precipitated her discharge was a public statement accusing the Bicentennial Corp. of racist policies, the corporation submits that Leslie's dismissal was nonetheless justified by the language of the Supreme Court in Pickering v. Bd. of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L. Ed.2d 811 (1968). *Pickering* rephrased the general rule stated above and held that absent proof of false statements knowingly or recklessly made, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment. However, the *Pickering* court posited certain exceptions to the general rule and enunciated a "balancing test" which is applicable here. For the reasons which follow (see dis-

---

1. *See, e. g.*, Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952) ; Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1952) ;

Keyishian v. Bd. of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) ; Pickering v. Bd. of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

cussion *infra*), we hold that under the principles of *Pickering*, the nature of Leslie's employment was such that she could indeed be properly discharged for utterances accusing the Bicentennial Corp. of racist policies. We turn first however to a recitation of our findings of fact upon which our legal conclusions are founded.[2]

## II. FINDINGS OF FACT

Leslie was hired as Bicentennial Corp.'s Coordinator of Community Development in December 1969 after interviews with Bicentennial Corp. Executive Director Robert McLean ("McLean") and Board Chairman Henderson Supplee ("Supplee"). The role of the Coordinator of Community Development was clearly portrayed for Leslie during those interviews.

As a counterpoint to its physical development program which had generated antipathy in Philadelphia's black community because of the amount of neighborhood displacement which it was expected to cause, the Bicentennial Corp. had conceived of the so-called "Agenda for Action" program. The Agenda for Action was conceived as a means of contributing to the betterment of the urban condition, particularly in the black areas of North and West Philadelphia, by an expenditure of substantial funds for community development in those areas. Leslie was informed by McLean that the principal duties of the Coordinator were: (1) to create and develop the Agenda for Action program; (2) to involve the black community in the program; and (3) to foster good community relations between the community in general, but particularly the black community, and the Bicentennial Corp. As to the latter point, McLean went so far as to say that they needed someone who could "walk a tight-rope", *i. e.*, defend the Bicentennial and sell its programs to the black community. Thus Leslie, a black woman with apparent credentials in working in the black community, was aware from the outset that tact and discretion were the order of the day. Leslie was also made aware that she would be expected to work in close cooperation with the other units within the Bicentennial Corp., especially the physical development staff.

The employment relationship was not confirmed by any written contract. McLean informed Leslie that he could make no guarantees or contracts. (No one on the Bicentennial Corp. professional staff had an employment contract.) Neither was any employment term agreed upon. Leslie was informed that the whole enterprise was rather "iffy," and that no one knew for certain whether there would be an exposition in Philadelphia because of the necessity of approval from Washington and Paris, about which there yet was doubt, or whether the Bicentennial activities would go on until 1976.[3] Leslie was informed that her salary would be $18,000 per year and that "promotions would be based upon performance." Under these terms she commenced work with the Bicentennial Corp. on January 12, 1970.

Shortly after joining the Bicentennial Corp. staff, Leslie received permission and funds from McLean to conduct a small informal meeting at her home for leaders of the various black communities in Philadelphia so that she could establish her credibility with them. Subsequently, a series of three meetings were planned at Chamounix Mansion in Philadelphia's Fairmount Park to inform community leaders about Bicentennial plans and to help them formulate their own plans for participation in the Bicentennial. These were supposed to be public

---

2. This opinion constitutes our findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

3. As of this writing, after months of uncertainty, the decision of the American Revolution Bicentennial Commission, approved on May 20, 1972, by President Nixon, has ruled out an international exposition in Philadelphia. For a capsule history of previous developments, see n. 4 to our earlier Opinion, 332 F.Supp. at 85.

meetings. They were conducted by Leslie with the assistance of one James Shelton ("Shelton"), president of New Dimensions in Training, Inc., a consultant to the Bicentennial Corp., which was responsible for training community representatives as part of the Agenda for Action program. At the second such meeting, on February 28, 1970, Leslie and Shelton asked all whites to leave. A Mrs. Marie Shumate, Director of the Haddington Leadership Conference, was in attendance and was also asked to leave until she protested that her "light skin betrayed her heritage." Shortly afterward, the Rev. Charles H. Riley, pastor of the Church of the New Life and New Horizons, arrived accompanied by his white assistant, Miss Barbara Blaisdell. They were also asked to leave by Shelton, who told them that the meeting was for black people only. An argument ensued, and Reverend Riley left after his white assistant ran from the meeting. Many of the black leaders who were present protested.

The following Saturday, March 7, 1970, another meeting was scheduled at the Chamounix Mansion. Reverend Riley again appeared, this time with another white assistant, and again they were asked to leave by Shelton, who said that the meeting was by invitation only and wa sfor blacks only. When they refused and said they would conduct a "sit-in" to protest black racism, they were physically removed. Following these incidents, McLean received a telegram signed by Augustus Baxter, Andrew Jackson, Mansfield S. Neal, and Harold J. Haskins, all black members of the Board of Directors of the Bicentennial Corp., expressing their displeasure and urgently requesting a meeting to discuss the future direction of the community development function and of Leslie's association with Bicentennial Corp. McLean and Supplee met with Baxter and Haskins, who strongly disagreed with Leslie's handling of the park incidents and asked that she be severed from the Bicentennial Corp. staff. However, McLean and Supplee felt that it was too early for such action, that Leslie was qualified for the work, and that there would be correction of any errors of judgment. Reverend Riley also charged Bicentennial Corp. with reverse racism and met with McLean and Leslie about these incidents.

On April 8, 1970, Bicentennial Corp. officials, including Leslie and Physical Development Director John Gallery ("Gallery") and representatives of the Pennsylvania State Highway Department, met with the West Philadelphia Bicentennial Committee, a community advisory group in that area of the city most affected by Bicentennial Corp. physical development plans. The meeting was called to elicit community reaction to the 30th Street site plan and the Schuylkill Expressway Bypass. Leslie was present to give a general Agenda for Action progress report, Gallery was to speak about physical development, and the highway consultants were to speak specifically about the bypass plans. There were about twenty-five community representatives at the meeting, racially mixed, but mostly black. As the Highway Department representative was giving his presentation, Leslie rose and interrupted him and urged the audience not to listen. She admonished the group that the present Bicentennial Corp. Board couldn't be trusted, that it did not represent the community interest, and that the community not only should not listen to it, but should organize to make its own demands on the corporation. A shouting match ensued and an angry mood prevailed.

Leslie's explanation for her conduct was that it was necessary for her to appear to be in opposition to the Bicentennial Corp.'s policies in order to win the confidence of the black community. However, we find that her attitude had a divisive effect on the West Philadelphia meeting, on the black community, and, as an important by-product, on the Bicentennial Corp. staff itself. Kenneth Shepard, a Bicentennial Corp. senior planner who was present at the meeting, felt demoralized as a staff member.

Gallery testified that it appeared as though there were two separate staffs within the corporation, working at odds with each other.

At a relatively early stage in her employment, Leslie made known to the staff and to the Agenda for Action Committee of the Board, chaired by John Bunting, her views that the Bicentennial Corp. did not believe in and was not supporting the Agenda for Action program, that it was going to scuttle it, and that the physical development program was receiving undue emphasis. In the wake of these expressions, at a meeting with McLean, Leslie was instructed that she was not to present herself in opposition to the Bicentennial Corp. policies, but was to represent them to the community and defend them. McLean conceded that this was a difficult role, but nonetheless stressed its importance. Leslie nodded assent. As it will appear, Leslie repeatedly violated these instructions.

Leslie testified at length about her doubts as to the sincerity of the Bicentennial Corp. commitment to the Agenda for Action program. However, we find that she in fact inadequately discharged her assigned task of developing the substance of that program. The record shows that she was not particularly innovative and resourceful, and that she was not particularly diligent either. She did not prepare a detailed "white paper" with respect to the Agenda, as she had agreed to do in March 1970. The reports which she was supposed to prepare for various committee meetings were invariably submitted too late for adequate review prior to the meetings, and a number of meetings had to be postponed on that account. Moreover, Leslie's reports were vague, general, lacking in factual data, devoid of reasoning and noted for the absence of specific recommendations. Leslie was not always cooperative with other members of the Bicentennial Corp. staff, often failing to supply material when needed, and was also often late for or absent from work. Leslie's failure to live up to the Community Development Coordinator's job specifications had its

effect on the Bicentennial Corp. Board as well. Her failure to develop concrete and specific proposals that it could support was, at least in part, responsible for the failure on the part of the Board to understand the Agenda for Action program.

During the summer of 1970, at the urging of James Milligan, the Bicentennial Corp. Coordinator of Public Relations, Leslie gave an interview to John Michael Willman, a reporter for the Philadelphia Inquirer. The interview was conceived as a vehicle for explaining the supposedly emerging Agenda for Action program to the public. However, the interview resulted, *inter alia*, in charges by Leslie that certain prominent Bicentennial Corp. Board members were guilty of conflicts of interest. While Leslie testified that all she had told Willman was that the black community *felt* that there were such conflicts of interest, we credit Willman's testimony that Leslie made the charges directly.

Following the interview, Willman determined that, before submitting his report of the interview for publication, he ought to inform Milligan of the interview and thus give the Bicentennial Corp. an opportunity to reply. When Milligan related the matter to his superiors, there was immediate consternation. Board Chairman Supplee promptly met with Leslie and indicated to her that her charges were most serious; however, Leslie persisted in her denial that she had made the charges directly. Milligan thereupon arranged for a confrontation between Willman and Leslie in an attempt to determine precisely what had happened during the interview. Willman reiterated his version; Leslie said nothing and averted her eyes. Supplee met again with Leslie and said that he could not resolve the conflicting stories, and that, because Leslie was a high level employee, he would stand behind her, leaving the matter to the determination of McLean, the corporation's chief executive officer, upon his return from vacation.

When McLean returned, in addition to the report of the Willman incident, he learned that Leslie had hired two employees without his consent. He then arranged a meeting with Leslie, and used the meeting as a vehicle to convey to her his general dissatisfaction with her job performance. *Inter alia*, he cited the hiring of the two employees, her tardiness in submitting reports, her (non-improving) failure to submit adequate reports, her poor working relationship with other staff members, the appearance that she was running a separate program from the rest of the staff, her poor judgment as reflected by the Chamounix Mansion incident, and her lack of loyalty to the corporation as reflected by the Willman incident. He reiterated the sensitivity of the Coordinator's job and pointed out that Leslie should have developed the aspirations of the various communities rather than alienating them from the Bicentennial. McLean concluded by saying that, while he felt that Leslie had real strengths that the Bicentennial Corp. could use, it was necessary that he look for a new Coordinator with stronger professional and administrative skills and better ability to communicate with the Board. In essence, Leslie was told not of her discharge, but of her demotion, for McLean stated that if she showed improvement in her work, she could remain with the Bicentennial Corp. staff.[4]

Thereafter, McLean commenced looking for a replacement. During the week of October 15, 1970, he hired James Roberts ("Roberts"), a black man, to replace Leslie as Director of Community Development. On Friday, October 16, McLean met with Leslie to inform her of this development and that Roberts would be starting work on October 19. Leslie inquired what effect this would have on her salary and what her responsibilities would be. McLean said that he could not tell her precisely, but advised her that it would be in her best interests to meet with Roberts immediately and work out the details of the working relationship. He cautioned her that she should not meet with anyone else. Leslie replied, "I'll see about that" and left McLean's office.

Over the weekend, Leslie conferred with Shelton, the consultant from New Dimensions in Training, over what course she should follow. On Monday, October 19, Leslie went to the New Dimensions Training Center, where a press conference had been called. Among those present were about twenty to thirty community representatives, members of the press, Leslie and Shelton. In answer to questions about her demotion, Leslie said that McLean told her "that the action had been taken because I was not cooperative enough" and she thereupon accused the Bicentennial Corp. administrators of being "racially biased." Leslie cited the fact that there were three other coordinators, all white, "who are paid $20,000 a year, as against the $18,000 I receive." She said that she would "wait and see" what developed before she acted. Although Leslie tried to convey the impression to the Court that she accidentally happened upon the press conference, we find (crediting other testimony) that she was less than candid in this respect and in fact was a leader of the press conference.

That evening, McLean received a telephone call from a reporter who informed him of the events at the press conference, and asked for his reaction. McLean replied that Roberts had been appointed Coordinator of Community Development, the first of a number of key assignments in planning for the celebration, and that Leslie could continue to play a significant role. He stated that if, however, Leslie had made public accusations against the corporation and its staff, he would have to reevaluate her position. The following morning, Tuesday, October 20, 1970, McLean conferred with Supplee about Leslie's future with the Bicentennial

4. Leslie's version is that she was faithful in the performance of her duties, but was in effect frozen out because she was thought to be a "troublemaker." We do not credit this version of the facts.

Corp. McLean told Supplee that he had serious doubts about keeping Leslie. Supplee stated that he felt the corporation had spent an inordinate amount of time defending Leslie's actions, and that he felt that there were always "more complications"; moreover, they were not making any headway on the Agenda for Action.

McLean obtained the newspaper account of the press conference and spoke to Roberts to determine his feelings. Roberts told McLean that he could no longer see any way to establish an effective working relationship with Leslie and that in view of her accusations, his own credibility was affected. McLean then met again with Supplee and told him that he felt that Leslie's services were no longer of benefit to the corporation and that he felt that she should be discharged. Supplee agreed. McLean also called John Bunting, a Bicentennial Corp. Board member and Chairman of the Agenda for Action Committee, to determine his views. Bunting concurred with the decision to discharge Leslie.

That afternoon, McLean summoned Leslie to his office. He asked her whether the remarks in the newspaper were correct. She said that they were. McLean reminded her of their September discussions and his advice to her on Friday, October 16, to meet immediately with Roberts, and of her failure to do so. He then informed her that her services were no longer needed and that they were being terminated immediately. He confirmed this by letter the following day.

As the foregoing recitation indicates, Leslie was given no formal hearing prior to her dismissal. We find, however, that she was fully informed as to the basis for it. We also find that the Bicentennial Corp. was a small organization and had no formal or informal procedures for granting hearings to employees prior to demotion or discharge, or for determining employee grievances.

The Bicentennial Corp. has urged upon us the finding that the sole reasons for Leslie's dismissal related to her lack of competence in her job. We do not so find. We are satisfied (and we find) that the principal reasons for Leslie's *demotion* were her demonstrated lack of administrative and professional skills resulting in the failure to adequately develop the Agenda for Action program,[5] and the view of Supplee and McLean that her judgment was poor and that her loyalty to the corporation was questionable. At the time of her demotion, the corporation did not act out of concern for utterances that Leslie had made about the corporation's leadership and policies; to the contrary, while aware of them, it had determined to "live with them." However, while the foregoing considerations carried over and were factors in Leslie's ultimate discharge, we find that the speech content, *i. e.*, the charge of racism, was a significant ingredient too.

Leslie's discharge occurred not in a vacuum, but against the background of the Chamounix Mansion incidents, the West Philadelphia incident, and the Willman incident, among others. In the wake of the racism charge, we find that the Bicentennial Corp.'s motivation (see n. 5) in discharging Leslie included: (1) its belief that Leslie could no longer be effective in involving the black community in the Agenda for Action program or in "selling" that program to it, or in fostering good relations between the black community and the Bicentennial Corp.; and (2) its belief that Leslie could no longer work effectively with the other members of the corporation staff or with its Board. We also find that effectiveness in these areas was not only critical to the proper performance of Leslie's assigned duties, but were the virtual essence of her role.

5. It is appropriate to observe that the fundamental (First Amendment) issue before us does not turn upon which side is correct in its assertions, for instance, as to Leslie's competence, but on what in fact was the Bicentennial Corp.'s belief as to that issue, and, more importantly, what the Bicentennial Corp.'s reasons were (justified or not) for discharging her.

### III. DISCUSSION

#### A. Did Leslie's Discharge Violate Her Constitutional Rights?

We noted at the outset of this Opinion the settled proposition that, as a general rule, one cannot be discharged from public employment because of the exercise of a first amendment right. *See* Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1952); Keyishian v. Bd. of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Pickering v. Bd. of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). In these cases, the Supreme Court has analyzed the competing interests of the employee as a citizen and the right of an employer qua employer to retain an efficacious employment relationship. However, in *Pickering*, the Court highlighted several areas of exception to the general rule. Our ultimate conclusion in this case, *i. e.,* that the facts as we have found them fall within what we find to be an exception to that rule, necessitates an exegesis of *Pickering*.

Pickering was a dismissed teacher who sued the Board of Education seeking reinstatement. He had been dismissed by the Board for sending a letter to a local newspaper attacking the manner in which the Board and the district superintendent of schools had handled past proposals to raise new revenues and criticizing the allocation between athletics and scholastics. After a full hearing, the Board dismissed Pickering, finding that the publication of the letter was "detrimental to the efficient operation and administration of the schools of the district." Pickering claimed that his right to express his views on public issues was protected by the First and Fourteenth Amendments. The Illinois Supreme Court affirmed the dismissal on the basis that Pickering's acceptance of a teaching position in the public schools obliged him to refrain from making statements about the operation of the schools, even though as a citizen he had a right to make them. The Supreme Court reversed, holding that in the absence of proof of false statements knowingly and recklessly made, Pickering's exercise of his right to free speech could not justify his dismissal.

In reviewing the facts of *Pickering*, Mr. Justice Marshall, speaking for the Court, found that the facts presented "no question of maintaining either discipline by immediate superiors or harmony among co-workers" and that the employment relationship between Pickering and the Board and superintendent were not the kind requiring "personal loyalty and confidence" in order to function properly. *Inter alia*, Mr. Justice Marshall observed:

"To the extent that the Illinois Supreme Court's opinion may be read to suggest that teachers may constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work, it proceeds on a premise that has been unequivocally rejected in numerous prior decisions of this Court . . . . At the same time it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." (citations omitted).

And also:

"We are thus not presented with a situation in which a teacher has carelessly made false statements about matters so closely related to the day-to-day operations of the schools that any harmful impact on the public would

be difficult to counter because of the teacher's presumed greater access to the real facts  . . . .

What we do have before us is a case in which a teacher has made erroneous public statements upon issues then currently the subject of public attention, which are critical of his ultimate employer *but which are neither shown nor can be presumed to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally . . . ."* (footnotes omitted, emphasis added).

The Court observed that the subject matter of Pickering's letter concerned an issue of general public interest, and, further, that the public had an interest in open discussion and debate on the issue. In light of the factors adverted to, application of the balancing test resulted in the conclusion that:

"In these circumstances . . . the interest of the school administration in limiting teachers' opportunities to contribute to public debate is not significantly greater than its interest in limiting a similar contribution by any member of the general public."

However, in sharp counterpoint to its holding, and as a veritable brake upon it, the Court added a pregnant footnote:

"It is possible to conceive of some positions in public employment in which the need for confidentiality is so great that even completely correct public statements might furnish a permissible ground for dismissal. *Likewise, positions in public employment in which the relationship between superior and subordinate is of such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between them can also be imagined.* We intimate no views as to how we would resolve any specific instances of such situations, but merely note that significantly different considerations would be involved in such

cases." *Id.* at 570, 88 S.Ct. at 1735 (emphasis added).

The parties have cited a number of cases decided pro and con in *Pickering*'s wake with a view to illustrating proper application of the "balancing test" and filling in the contours of that footnote. *See, e. g.,* Caldwell v. Craighead, 432 F. 2d 213 (6th Cir. 1970), cert. den. 402 U.S. 953, 91 S.Ct. 1617, 29 L.Ed.2d 123 (1971); Muller v. Conlisk, 429 F.2d 901 (7th Cir. 1970); Cooley v. Bd. of Educ., 327 F.Supp 454 (E.D.Ark.1971); Ahern v. Bd. of Educ., 327 F.Supp. 1391 (D. Neb.1971); Roberts v. Lake Central School Corp., 317 F.Supp. 63 (N.D.Ind. 1970); Lefcourt v. Legal Aid Society, 312 F.Supp. 1105 (S.D.N.Y.1970); Jones v. Battles, 315 F.Supp. 601 (D.Conn.1970); Murphy v. Facendia, 307 F.Supp. 353 (D.Colo.1969); Watts v. Seward School Bd., 454 P.2d 732 (Alaska Sup.Ct.1969). In view of our findings of fact, it is necessary to discuss but one case which is typical of them.

*Jones v. Battles, supra,* was a civil rights action to restrain the board of education from refusing to renew a teacher's contract. The board of education had refused to renew the contract after Jones, a non-tenured (probationary) teacher made statements at open public hearing referring to the director of secondary education as a liar, questioning his honesty and competence, and challenging the integrity of the entire administrative staff of the board of education. Jones alleged that the defendants had denied him employment because he had exercised his constitutional right of free speech and that the refusal to renew his contract was consequently impermissible. The court, however, found that Jones had transgressed the protected limits of the privilege afforded by New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and that his charges against the board and superintendent exceeded the legitimate criticism protected by the First Amendment. In addition, the court specifically found that the abusive language directed toward his nominal

superior "was of such a nature as to destroy any likelihood of a future amiable professional relationship between him and the administrative staff," and that his rehiring "would invite friction and destroy staff morale." *Id.*, 315 F. Supp. at 608. In these circumstances, the court held that the First Amendment did not protect Jones and that the action of the school board was justified.

█ Our findings of fact in this case have posited that Leslie's duties required her to foster good community relations between the community in general, and particularly the black community, and the Bicentennial Corp. She was charged with defending the Bicentennial Corp. and "selling" its programs to the community, while at the same time eliciting the community's support for those programs. Leslie's duties specifically included the development of the Agenda for Action program and the coordination of those activities with the balance of the Bicentennial Corp. staff and Board. In view of incidents at Chamounix Mansion, the Willman interview, and the accusations of racism, *inter alia*, we have found that the Bicentennial Corp.'s motivation in discharging Leslie included: (1) its belief that Leslie could no longer be effective in involving the black community in the Agenda for Action program or in "selling" that program to it, or in fostering good relations between the black community and the Bicentennial Corp.; and (2) its belief that Leslie could no longer work effectively with the other members of the corporation staff or with its Board. We conclude that these motivations legally support the Board's action.

Unlike the situation in *Pickering*, Leslie's duties required a high degree of cooperation and loyalty with her coworkers and supervisors, and yet, like the situation in *Jones*, her actions were destructive of staff morale and made an effective working relationship impossible. Unlike the facts in *Pickering*, Leslie's pejorative public pronouncements not only impeded the proper performance of her duties as Coordinator of Community Relations, they made it impossible. And, in contrast to the *Pickering* milieu, Leslie's statements, because of their divisive effect upon the community, interfered with the regular operation of the Bicentennial Corp., which desperately needed public good will if it was to succeed. We read *Pickering* as indicating that a discharge is appropriate under such circumstances.

We have no doubt that the issues raised by Leslie were of genuine public concern and that (as in *Pickering*) a difference of opinion was a matter of public interest. However, applying the *Pickering* balancing test, we find that, in the circumstances of this particular case, and in view of the exceptionally sensitive nature of Leslie's duties, the right of the Bicentennial Corp., Leslie's employer, to promote its objectives through her particular role outweighed her right to speak as a citizen in the manner which she did while she remained in the Bicentennial Corp.'s employ. We thus hold that Leslie's discharge was justified and did not infringe upon her constitutional rights.

B. *Did Leslie Have a Right to a Formal Administrative Hearing Prior to Her Discharge?*

Leslie has also contended that her discharge was invalid because she was not accorded a hearing. In a sense, this case is sui generis, for we know of no other instance (*cf.* our first Opinion in this case, 332 F.Supp. 83) where an organization which exists for but a limited duration and for a single purpose has been held to partake of state action. Hence, we can find no cases enunciating procedural due process prerequisites to the discharge of an employee in a situation substantially similar to that of Leslie. Leslie had no contract for a fixed term or any sort of tenure. The closest analogy which we can thus find to her situation is in the caselaw dealing with the right of a non-tenured teacher to a hearing prior to discharge or precedent to the failure of the school board to renew his contract. However, these cases

arise in the framework of a more formal and more permanent organizational setting, for in practically all states a statutory hearing procedure is provided for the discharge of tenured teachers, making a regular administrative procedure available in non-tenured situations where required.

There are some cases which hold that a non-tenured teacher has an absolute right to a hearing, even where no constitutionally protected rights are involved. *See* Roth v. Bd. of Regents, 310 F.Supp. 972 (W.D.Wis.1970); Gouge v. Joint School Dist., 310 F.Supp. 984 (W.D. Wis.1970). This is clearly a minority position. There is a split of authority on whether a hearing is required in cases where an impermissible constitutional ground is asserted as the cause of the dismissal. *See* Roth v. Bd. of Regents, *supra*, Sindermann v. Perry, 430 F.2d 939 (5th Cir. 1970), and Ferguson v. Thomas, 430 F.2d 852 (5th Cir. 1970), which exemplify those cases according an untenured teacher the right to a hearing. However, we believe that the better view is exemplified in the opinion of the First Circuit in Drown v. Portsmouth School Dist., 435 F.2d 1182 (1970).

Drown had been employed as a non-tenured teacher for the school years 1968–69 and 1969–70 under New Hampshire's standard one-year teacher's contract. She was given timely notice that she would not be re-hired for the 1970–71 school year. She then sought and was denied a statement of reasons for this decision and a hearing to challenge it. Thereafter she commenced a civil rights action against the school district, administration, and school board members, claiming that the refusal to grant her a hearing violated her due process rights. The district court dismissed the plaintiff's complaint for failure to state a cause of action. The Court of Appeals reversed for the reason that "the interests of the nontenured teacher in knowing the basis of his non-retention are so substantial and the inconvenience and disadvantages for a school board of supplying this information are so slight as to require a written explanation, in some detail, of the reasons for non-retention, together with access to evaluation reports in the teacher's personnel file." *Id.* at 1185. However, the court also held that the denial of a formal hearing did not violate the plaintiff's due process rights.

The *Drown* court's approach to the determination of whether due process required a particular procedure was through the application of a balancing test in which the matters to be weighed are the protection afforded the teacher and the cost to the school district, in light of the competing interests of each. Judge Coffin spoke for the Court. He first found that providing the teacher with a nonrenewal decision statement afforded significant protection to the teacher: such a statement would militate against the possible suspicion that nonrenewal was based upon lack of competence, would facilitate the teacher's ability to combat the decision, and would lessen the possibility of constitutionally impermissible nonrenewal decisions. Moreover, the court found the costs to the school board of such a statement to be relatively insignificant. On the other hand, the court found the costs to the school district of a *hearing* to be significant in terms of: (1) time and effort; (2) a probable lowering of standards for contract renewal, and a reluctance to hire more creative and innovative teachers or to fire incompetent ones motivated by the desire to avoid the unpleasantness of a hearing; and (3) in terms of the untoward effect of delegating the final review responsibility to an independent hearing body, thus preventing the school board from exercising its hearing discretion in a disputed case, where the most sensitive issues of hiring policy are likely to arise. Moreover, the court found that a hearing in many instances might act as an obstacle to a judicial remedy since the complaining teacher would be confronted with the prospect of two full-scale constitutional presentations, where one would suffice.[6]

6. For an excellent discussion of *Drown*, see Casenote, 85 Harv.L.Rev. 1327 (1972).

Insofar as we can analogize the facts and considerations operative in this case to those of *Drown,* we are satisfied that its precedent supports the position of the Bicentennial Corp. that no administrative hearing was constitutionally required. While Leslie received no formal hearing, on at least two occasions she received informal hearings with McLean and on one occasion with Supplee, at which time she was informed of the reasons for her demotion and dismissal. Moreover, she obtained a prompt judicial hearing, at which her claimed constitutional deprivations have been fully aired and determined. An administrative hearing would have been no less time-consuming and inconvenient to both Leslie and the Board and would have delayed the (inevitable) lawsuit.

However, even if *Drown* was incorrectly decided, we do not believe that Leslie was entitled to a formal administrative hearing. It is, in fact, difficult to conceive of just what type of independent administrative hearing could have been afforded to Leslie within the framework of the Bicentennial Corp. The Bicentennial Corp., as we have noted, exists for a single purpose and will dissolve when that purpose is completed. The Bicentennial Corp. staff is small, and there is no structure within its organizational setup which appears suitable for the hearing procedure. In our view, the appropriate means of resolving her dispute was in the fashion that it has been resolved—in this proceeding.[7]

## IV. CONCLUSION

Having balanced the interests of the parties, and having considered Leslie's penultimate and ultimate meetings with McLean and Supplee, we have been lead to the conclusion that a formal administrative hearing was not required in these circumstances. Having considered the nature of Leslie's job and the circumstances under which she was dismissed, we have concluded that her discharge was justified under the applicable constitutional principles.

---

7. We note, too, that Leslie never requested a hearing. Her attorney did, by letter to Bicentennial Corp. counsel, but only as he was in the course of filing the instant lawsuit.